IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,360

STATE OF KANSAS,
*Appellee*,

v.

BRETT T. SEACAT,
*Appellant.*

SYLLABUS BY THE COURT

1.

Evidence of prior crimes or civil wrongs under K.S.A. 2014 Supp. 60-455(b) that consists of or includes hearsay evidence must pass the K.S.A. 2014 Supp. 60-460 requirements for admissibility of hearsay.

2.

In a prosecution for homicide, in order to present evidence of a deceased's declarations or threats suggesting a suicidal disposition, a defendant must show that the declarations or threats were made within such a reasonable time before the death that they tend to show the deceased's mood or disposition at the time of the death.

3.

Speculative evidence is inadmissible, and a trial court has the responsibility of ensuring that speculative evidence does not reach the jury.

4.

The burden is on the defendant to show that a witness' improper answer to a question resulted in substantial prejudice to the defendant.

1

Appeal from Kingman District Court; LARRY T. SOLOMON, judge. Opinion filed January 15, 2016. Affirmed.

*Debra J. Wilson*, of Capital and Conflicts Appellate Defender Office, argued the cause, and *Reid T. Nelson,* of the same office, was with her on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  Brett T. Seacat takes this direct appeal from his conviction by a jury of one count of first-degree premeditated murder, one count of aggravated arson, and two counts of aggravated endangerment of a child. Finding no error on the part of the trial court, we affirm.

In April 2011, Seacat lived with his wife, Vashti, and their two sons in their house in Kingman, Kansas. Seacat was employed at the time as a police instructor at the Kansas Law Enforcement Training Center. He had previously worked for the Sedgwick County Sheriff's Department. In the early morning of April 30, police and fire personnel responded to a call to the Seacat residence, where they found the house on fire and found Vashti lying dead on her bed, the victim of a gunshot wound to her head. The circumstances of the fire and her death would become the focus of Seacat's criminal trial.

For several years, his marriage with Vashti had shown signs of troubles. In November 2010, Seacat and Vashti began seeing Connie Suderman, a clinical social worker, for marital counseling. Suderman met with Seacat and Vashti together, and with Vashti individually, through the end of April 2011. She also met several times

2

individually with Seacat. As the counseling continued, Vashti and Seacat considered the possibility of divorce.

According to Suderman, Vashti's mood was sad and symptomatic of depression when the counseling began. Those symptoms improved "dramatically," and by April 2011, Vashti was saying that she felt better than she had in years. Vashti's outlook became hopeful, and she was making healthy life changes, such as exercising and eating better, as well as planning to move closer to her sister and to her place of employment. Vashti spoke often about her sons, about how she loved them and how she loved being a mother.

In response to a direct question from Suderman, Vashti said she would never commit suicide because of her religious faith and because of her love for her sons. She also relayed to Suderman that Seacat was not handling the prospect of divorce well and had threatened to kill her if she left him. In individual counseling, Seacat told Suderman that, if Vashti divorced him, he would make sure that she never saw her children again, even if it meant taking them out of the country.

On April 19, Vashti had her last individual session with Suderman. Vashti reported that Seacat had awakened her one night and told her that he had a dream in which he killed her. She was worried about how he would react to her filing for divorce, and she wanted to have someone with her and the children when he was served with process. Suderman and Vashti arranged for a safety plan for Vashti's protection when she served Seacat with divorce papers.

Seacat knew that Vashti wrote a personal journal, which she kept on a table beside the bed. About a month before her death, Seacat took the journal to the Center and

scanned and subsequently printed numerous pages. He testified that he did this at Vashti's request, because she wanted an electronic copy of the journal as a keepsake.

On the morning of April 29, Seacat drove to his office and opened an envelope containing the divorce papers that Vashti had given him. That afternoon, while still at work at the Law Enforcement Training Center, he located an overhead projector in storage and used it for about an hour. Seacat then inquired of maintenance staff the best way to dispose of computer hard drives, and on their recommendation he used a torch to destroy the drives and threw the melted hard drives in a trash can. He next decided to throw three old cell phones in the trash because they had not been used for a long time, believing they had little or no resale value. Later that afternoon, he drove to a convenience store and purchased gasoline, which he testified he put into his pickup truck.

Early in the morning of April 30, 2011, police responded to a report of a fire and possible shooting at the Seacat residence. The second story of the house was in flames, and Seacat was standing in the backyard by the driveway. The police officer asked Seacat whether anyone was inside the house, and Seacat responded that his wife was there. The officer inquired further, and Seacat said, "She's dead. She shot herself. Her fucking head is gone."

After the fire department arrived and extinguished the fire, Vashti's body was found lying on a bed in an upstairs bedroom. An investigator found a Ruger Redhawk 44-caliber revolver lying on the bed under Vashti's body, with the barrel pointed down toward her legs. A single gunshot wound through her head and into her neck proved to be the cause of her death. A 5-gallon gasoline container was lying on the middle of the bed.

A neighbor who had been unable to sleep was awake and watching a television program that morning. She heard a sound which she described as sounding like a

4

gunshot, based on other gunshots she had heard in the past. Frightened, she covered her head until she saw the lights of emergency vehicles arriving. Based on the timing of what was taking place on the show she was watching when she heard the gunshot, investigators concluded that she heard the shot at 3:15 a.m.

An investigating special agent later determined from the burn patterns and different kinds of damage that the fire started in the hallway and moved south to north into the bedroom. Searching through the house, investigators found on the dining room table a water-soaked printed PowerPoint presentation that included information about suicide wounds and death investigations, specifically, death investigations involving fires. One of the pages discussed investigations distinguishing between homicides and suicides, and one page discussed reasons for suicides, including severe marital strife, recent emotionally damaging experiences, financial difficulties, humiliation, and revenge.

The coroner's report and testimony indicated that Vashti nearly instantaneously died from a bullet wound to her head. She had also sustained gunshot wounds to her torso, hip, and thigh. These wounds were consistent with shots "cooking off" the gun from the heat of the fire. Blood tests and lung tests were negative for smoke inhalation. Blood and urine tests were also negative for alcohol and a wide variety of drugs. The coroner reached no conclusion as to whether the death was murder or suicide.

On May 13, 2011, the State filed a complaint/information charging Seacat with one count of premeditated first-degree murder, one count of aggravated arson, and two counts of aggravated endangering a child based on the presence of the couple's two sons in the house at the time of the fire.

The State's theory at trial was that Vashti was in good spirits and was looking forward to a new life after her marriage. Seacat was unwilling to accept divorce as the

way his marriage would end. He threatened Vashti that he would murder her, burn the house down, and convince investigators that it was a suicide based on his expertise in law enforcement. He used an overhead projector to project her handwriting from her journal and trace the letters to compose a suicide note. When it appeared to him that she was going to go through with the divorce, he shot her in her sleep, doused the hallway and bedroom with gasoline, placed a call from her phone to his phone, and then lit the fire.

Seacat's theory was that, while Vashti was outwardly in good spirits, she was privately uncertain and depressed about her faltering marriage. She took Seacat's threats seriously that he would take the children and she would never see them again. She made up stories about him threatening to kill her so that she would have an improved posture with friends and courts in the event of a contested divorce. Seacat borrowed her journal to do her the favor of scanning it, and he borrowed the overhead projector to learn more about forgeries for his work at the police academy. Having filed for divorce, Vashti became overwhelmed with regret, sought to burn the house down with her children it, and shot herself.

Vashti's journal was pivotal to the case. If Vashti had written about planning to commit imminent suicide, it would strongly bolster Seacat's theory. If, on the other hand, the expression of suicidal ideation was forged, it would seriously undermine his theory and bolster the State's case.

Two days after the death and fire, investigators found Vashti's journal in her car. On the last page was a hand-written message reading:

"Brett- I can't do this. I can't fight this out. Take care of our boys. Be sweet to Brendon. Talk to Bronson. Hold them both and tell them 'Mommy loves them' every night. I'm taking care of the house.

"Brendon – you are so wonderful. Mommy is so proud of you. Be a good big brother.

"Bronson – stay strong and don't ever lose that smile.

"I love the two of you and will be watching over you from Heaven."

Dennis McPhail, a certified forensic document examiner for the Kansas Bureau of Investigation, testified for the State. He testified that there were certain incongruities in the last journal page that led him to conclude that the writing had been traced from other samples of Vashti's handwriting. These discrepancies included tremorous writing and smearing, which contrasted sharply with the fluid writing that was highly consistent in Vashti's known writing samples. He pointed to features indicating that the writing had been done slowly, with added corrections to certain letters. He noted that Vashti's lower case "d" was very consistent throughout many samples of her handwriting, but it was formed using a different stroke in the last journal page. These and other specific disparities led him to conclude that the suicide note was probably traced and was a "spurious document."

Avis Odenbaugh, a forensic document examiner called on Seacat's behalf, testified that the journal page was the product of natural writing and that the journal page in question was written by the same person who wrote the other entries in the journal. She ruled out a tracing of the text based on apparent ink flow. Odenbaugh testified that differences in the handwriting between the journal page and other samples of Vashti's handwriting could be explained because of mood or tension. On cross-examination, she acknowledged that the first part of the journal page appeared unnatural and that there were tremors apparent in writing some of the letters, but she explained that those could be due to medication or state of mind.

Also important to resolving the opposing theories of the event were out-of-court statements attributed to Vashti. Some of these statements indicated that Seacat had

threatened to kill her and make the murder look like a suicide. Other statements were introduced by Seacat and would suggest that Vashti was depressed and suicidal on the evening of the fire.

After a 12-day trial, the jury found Seacat guilty on all four counts, and the district court sentenced him to a life sentence without the possibility of parole for 25 years for the murder conviction, a consecutive sentence of 61 months for the aggravated arson conviction, and consecutive sentences of 7 months for each of the child endangerment convictions. He takes a timely appeal to this court.

All of Seacat's issues go to the evidence that the district court allowed the jury to hear—the admission of certain testimony by witnesses for the State and the exclusion of certain evidence proffered by Seacat. The first issue that he raises challenges the admissibility of several out-of-court statements made by Vashti to friends and coworkers. The next three issues challenge the trial court's exclusion of evidence relating to Vashti's putative depression, which Seacat contends would have bolstered his theory that she took her own life. A fifth issue relates to an answer that a witness gave on direct examination, which Seacat contends was nonresponsive and prejudicial.

## I. VASHTI'S OUT-OF-COURT STATEMENTS

The trial court granted parts of the State's pretrial motion to introduce certain out-of-court statements made by Vashti reflecting her fear of Seacat and threats that he allegedly made to her. In admitting certain statements, the trial court explicitly relied on both a statutory exception to the hearsay rule and on K.S.A. 2014 Supp. 60-455 evidence of prior crimes or misconduct. At trial, Seacat renewed his objections based on hearsay but did not bring up admissibility under K.S.A. 60-455, and the trial court accordingly

8

never conducted further analysis under that statute. Seacat maintains on appeal that some of the out-of-court statements were impermissible, prejudicial hearsay.

A. *Preservation of Certain Out-of-Court Statements for Appellate Review*

The State initially contends that Seacat waived any challenge to those out-of-court statements that were admitted under theories of both a hearsay exception and K.S.A. 2014 Supp. 60-455(b), relating to the admissibility of evidence of other crimes or civil wrongs. In his opening appellate briefing, Seacat did not challenge the 60-455(b) basis for admitting that testimony. The State contends that any error in admitting these statements as exceptions to the statutory rule against hearsay is rendered harmless by the failure to argue against 60-455(b) as an independent basis for admission.

This court has held that the failure to brief and argue an issue constitutes abandonment of the issue. See, *e.g.*, *State v. Johnson*, 269 Kan. 594, 602, 7 P.3d 294 (2000). In *State v. Godfrey*, 301 Kan. 1041, 1043-44, 350 P.3d 1068 (2015), we strictly applied Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41), requiring that an issue must be briefed in order to be preserved for consideration on appeal. We relied on *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014), which succinctly held: "When a litigant fails to adequately brief an issue it is deemed abandoned."

The question that the State presents, then, is whether an argument that is limited to the admissibility of hearsay evidence may include a challenge to the admissibility of evidence under K.S.A. 2014 Supp. 60-455. In order for Seacat to prevail on this question, he must demonstrate that an out-of-court statement must pass inspection for hearsay admissibility as a threshold requirement for bad-acts admissibility.

9

K.S.A. 2014 Supp. 60-455(a) and (b) reads:

> "(a) Subject to K.S.A. 60-447, and amendments thereto, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.

> "(b) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Seacat contends that K.S.A. 2014 Supp.60-455 is a "rule of exclusion," citing *State v. Wasinger*, 220 Kan. 599, 602, 556 P.2d 189 (1976). This is certainly the case with K.S.A. 2014 Supp. 60-455(a). See *State v. Prine*, 297 Kan. 460, 475-76, 303 P.3d 662 (2013). This court has never explicitly held, however, that K.S.A. 2014 Supp. 60-455(b) is a rule of exclusion, and more recent analysis of the statute suggests that this subsection is a rule of inclusion. See, *e.g.*, *State v. Gunby*, 282 Kan. 39, 56-57, 144 P.3d 647 (2006) (statutory grounds for admission is "inclusive rather than exclusive"; other crimes and civil wrongs evidence "that passes the relevance and prejudice tests . . . should always have been admissible"). The plain language of K.S.A. 2014 Supp. 60-455(b) supports our holding in *Gunby*: subject to limited exceptions, evidence of prior crimes or civil wrongs *is* admissible if it proves some other material fact.

Such an inclusive understanding of K.S.A. 2014 Supp. 60-455(b) is consistent with the interpretation of analogous statutes in other jurisdictions.

In *Huddleston v. United States*, 485 U.S. 681, 687-88, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), the United States Supreme Court held that the text of the federal analog to K.S.A. 2014 Supp. 60-455, Fed. R. Evid. 404(b)(2), contains no indication that any preliminary showing is necessary in order to introduce 404(b) evidence for a proper purpose; if it is offered for a proper purpose, the evidence is subject only to general strictures limiting admissibility, such as relevance and undue prejudice. Various federal circuit courts have held that Rule 404(b)(2) is an "inclusionary" rule that admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402. See, *e.g.*, *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011); *United States v. Wilson*, 624 F.3d 640, 651 (4th Cir. 2008); *United States v. Baker*, 432 F.3d 1189, 1204-05 (11th Cir. 2005); *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003); *United States v. Alfonso*, 759 F.2d 728, 739 (9th Cir. 1985).

In light of *Huddleston*, the Tenth Circuit relaxed prior restrictions on the admission of Rule 404(b) evidence and adopted the position that the rule is inclusive, not exclusive. *United States v. Record*, 873 F.2d 1363, 1373-76 (10th Cir. 1989). The Tenth Circuit has continued to follow this standard for admissibility: "Rule 404(b) is considered to be an inclusive rule, admitting *all* evidence of other crimes or acts except that which tends to prove *only* criminal disposition." (Emphasis added.) *United States v. Watson*, 766 F.3d 1219, 1235 (10th Cir. 2014).

A majority of other states have reached the same conclusion when analyzing their versions of the federal rule. See, *e.g.*, *State v. Messersmith*, 238 Neb. 924, 929-30, 473 N.W.2d 83 (1991) (statue allowing evidence of other crimes and wrongs is inclusionary rule); *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48 (1990) (statute is a "clear general rule of inclusion of relevant evidence of other crimes" subject to only one exception—that defendant has propensity to commit offense of nature of crime charged);

11

*State v. Pratt*, 309 Or. 205, 210, 785 P.2d 350 (1990) (statute is one of inclusion; other crime evidence is admissible under any theory of logical relevance that does not run afoul of prohibition on propensity to commit crimes); *cf State v. Nance*, 148 N.J. 376, 386-87, 689 A.2d 1351 (1997) (rule is exclusionary, subject to exceptions such as intent, motive, or identity).

Although we reaffirm the principle that K.S.A. 2014 Supp. 60-455(b) is an inclusionary rule, our analysis does not end here. K.S.A. 2014 Supp. 60-460 is an exclusionary rule; it forbids hearsay evidence, subject to certain enumerated exceptions. See, *e.g.*, *State v. Coones*, 301 Kan. 64, 81, 339 P.3d 375 (2014); *State v. Stafford*, 296 Kan. 25, 47, 290 P.3d 562 (2012). If evidence is to be *included* under K.S.A. 2014 Supp. 60-455(b) but *excluded* under K.S.A. 2014 Supp. 60-460, which statute governs the ultimate admissibility of the disputed evidence?

This court has not conducted an in-depth analysis of such a conflict. In *State v. Carapezza*, 286 Kan. 992, 191 P.3d 256 (2008), the State introduced evidence of the defendant's attempts to cash checks against a closed checking account. The trial court admitted the evidence as relevant to establishing motive and plan under K.S.A. 60-455, but the defendant objected based only on hearsay. This court concluded that the defendant's failure to raise the 60-455 issue to the trial court precluded appellate review. 286 Kan. at 1002. While the *Carapezza* holding supports the State's position in the present case, *Carapezza* relied on *State v. Francis*, 282 Kan. 120, 138, 145 P.3d 48 (2006), for authority. See 286 Kan. at 1002. *Francis*, however, involved a situation in which *no* objection was made at trial to the introduction of testimony.

This court has consistently applied a three-part test for the admissibility of evidence of crimes or civil wrongs under K.S.A. 2014 Supp. 60-455(b): whether the evidence is material, that is, that it has some real bearing on the decision in the case;

12

whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed fact; and whether the probative value of the evidence outweighs the potential for undue prejudice against the defendant. See *State v. Longstaff*, 296 Kan. 884, 891-92, 299 P.3d 268 (2013). This court has not included in the test a requirement that the evidence also be admissible under other statutory exclusionary restrictions. Courts considering the analog federal rule have also not elected to impose a hearsay-admissibility threshold requirement. See, *e.g.*, *United States v. Joe*, 8 F.3d 1488, 1495 (10th Cir. 1993) (setting out requirements for admissibility of other bad acts).

There is some authority supporting the State's contention that failure to preserve a challenge to K.S.A. 2014 Supp. 60-455 admissibility waives a hearsay challenge. In *United States v. Munson*, 819 F.2d 337 (1st Cir. 1987), the court considered a defendant's claim that certain out-of-court statements were admitted without objection in violation of the rules against hearsay. The First Circuit concluded that the evidence would have been admissible even in the presence of an objection under the independent grounds of Rule 404(b). 819 F.2d at 342; see also *United States v. Rivera-Sola*, 713 F.2d 866, 871 (1st Cir. 1983) (defendant objected only on grounds of hearsay; evidence was independently admissible under Rule 404[b]). In *Baker*, 432 F.3d at 1219, the Eleventh Circuit found a particular out-of-court statement to be inadmissible as hearsay but admissible under Rule 404(b).

Similarly, when the objection at trial was based only on hearsay, the trial court's admission of the evidence under the independent grounds of Federal Rule of Evidence 404(b) was not preserved on appeal and was subject to plain-error analysis. *United States v. Harper*, 502 Fed. Appx. 447, 451-52 (6th Cir. 2012); see also *Baker*, 432 F.3d at 1207 (defendant objected only to hearsay, not to Rule 404[b] admissibility, so standard of appellate review is plain error); *State v. Taylor*, No. COA12-529, 2013 WL 1121333 (N.C. App. 2013) (unpublished opinion) (defendant's failure to object to hearsay was

13

harmless because statement was properly admitted under Rule 404[b]); *State v. Thompson*, No. COA09-1326, 2010 WL 2816958 (N.C. App. 2010) (unpublished opinion) (defendant objected to admission of evidence as hearsay; Court of Appeals found admissible under Rule 404[b] allowing evidence of other crimes, wrongs, or acts to show motive, intent, and common plan or scheme); *Oliver v. State*, Case No. 04-14-00261-CR, 2015 WL 505072, *2 (Tex. App. 2015) (unpublished opinion) (objection made in context of hearsay failed to preserve Rule 404[b] issue for appellate review); *State v. Phillips*, 194 W. Va. 569, 585 n.25, 461 S.E.2d 75 (1995) (evidence inadmissible under one theory may be admissible under different theory; hearsay statements may therefore be admitted under Rule 404[b] as proof of motive, intent, etc.).

Other courts, however, have treated the hearsay exclusion as a threshold barrier to admitting prior crimes and civil wrongs evidence. See, *e.g.*, *James v. State*, 723 So. 2d 776, 779-81 (Ala. 1998) (inadmissible hearsay threats could not be used to support Rule 404[b] purposes of proving intent, motive, preparation, plan, knowledge, and identity); *State v. Charo*, 156 Ariz. 561, 563, 754 P.2d 288 (1988) (evidence of prior bad acts may only be admitted if testimony falls within exception to hearsay rules); *People v. Nara*, 964 P.2d 578, 580 (Colo. App. 1998) (Rule 404[b] evidence may not be admitted when it is based on inadmissible out-of-court statements); *People v. Raffaelli*, 701 P.2d 881, 885 (Colo. App. 1985) (if evidence is inadmissible hearsay, reliance on Rule 404[b] is misplaced); *State v. Mitchell*, 169 N.C. App. 417, 421, 610 S.E.2d 260 (2005) (inadmissible hearsay statements may not be used to support grounds for admission under Rule 404[b]); *King v. State*, 765 S.W.2d 870, 872 (Tex. App. 1989) (Rule 404[b] does not allow introduction of otherwise-inadmissible hearsay to show motive or intent); *People v. Fenton*, No. SX-10CR-347, 2013 WL 7176406, *2 (V.I. Super. 2013) (unpublished opinion) (impermissible hearsay precludes application of Rule 404[b]).

We are persuaded that the latter approach is the more sensible. K.S.A. 2014 Supp. 60-455(b) evidence frequently consists of hearsay. It will often be the case that evidence of a prior crime or civil wrong is based on written reports or out-of-court statements. The hearsay statute does not list evidence of prior crimes or civil wrongs as an exception to the rule against hearsay, and admitting such evidence as an implicit exception to the hearsay rule would threaten to swallow up the common law and statutory prohibition without providing defendants protection against unreliable hearsay testimony. We, therefore, conclude that evidence of prior crimes or civil wrongs permitted under K.S.A. 2014 Supp. 60-455(b) must still pass the K.S.A. 2014 Supp. 60-460 requirements for admissibility if the evidence also qualifies as hearsay.

B. *The Admissibility of Vashti's Out-of-Court Statements*

Seacat contends that the district court improperly admitted hearsay testimony relating to both his intentions and motives for murdering Vashti.

A friend and coworker of Vashti, Joy Trotnic, testified that Vashti asked her a couple of weeks before the fire, "Do you think Brett would burn the house down with me in it?" Another coworker, Scott Hankins, testified that Vashti reported to him that Seacat had made various threats to her: he had threatened to kill himself if she filed for divorce; he had threatened to take the children and disappear; and he had threatened to kill her, burn down the house, and make it look like a suicide, which he could get away with because he was in law enforcement and knew that firefighters were "idiots." He also testified that Seacat woke Vashti up one night and told her he was having recurring dreams of killing her. Melissa Beasley also testified about the threats that Seacat would kill Vashti and burn down the house in such a way that it would appear that Vashti had set the fire herself. Beasley substantiated the testimony that Vashti reported Seacat recounting a dream in which he killed her. Connie Suderman, the social worker who

15

counseled both Vashti and Seacat, testified about comments that Vashti made during therapy, including the dream and a threat that if Vashti ever cheated on him, Seacat would kill her.

Not every statement to which Seacat objects is subject to hearsay exclusion. As the State correctly points out in its responsive brief, Trotnic's testimony that Vashti asked her whether she thought Seacat would murder her and burn down the house, while inferentially incriminating, was not hearsay. The statement was not offered to prove the truth of a matter stated, because the question did not state a matter. It instead sought an opinion, and it therefore was not hearsay.

Other statements, however, were hearsay. The admissibility of evidence under an exception to the hearsay rule is reviewed for abuse of discretion. *State v. Coones*, 301 Kan. 64, 80, 339 P.3d 375 (2014). A trial court abuses its discretion when no reasonable person would take the view adopted by the trial court, when the judicial action is based on an error of law, or when the judicial action is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* ___ U.S. ___, 132 S. Ct. 1594 (2012).

Subject to certain exceptions, K.S.A. 2014 Supp. 60-460 bars the "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated . . . ." The theory behind the rule excluding hearsay evidence is that the credibility of the declarant is the basis for the reliability of the statement, and the declarant must therefore be available for cross-examination. *State v. Cosby*, 293 Kan. 121, 127, 262 P.3d 285 (2011).

16

Vashti's out-of-court statements were offered to prove the truth of the matter stated–that she reported threatening statements and behavior by Seacat. The trial court admitted those statements under the statutory exception of necessity:

"A statement which the judge finds was made . . . if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort." K.S.A. 2014 Supp. 60-460(d)(3).

Seacat does not dispute that Vashti was unavailable to testify and that the out-of-court statements were relevant. Seacat contends that Vashti's statements were not made when his alleged threats were recently perceived and that she had incentive to falsify or distort them.

A trial court is necessarily given considerable discretion in admitting statements under K.S.A. 2014 Supp. 60-460(d)(3). *State v. Hobson*, 234 Kan. 133, 158, 671 P.2d 1365 (1983). "[T]he presence or absence of an incentive to falsify or distort is a question of fact to be determined by the trial judge in light of all the circumstances." 234 Kan. at 158. The appellate court is in no better position than the trial court to decide whether the unavailable witness had incentive to distort or falsify statements. *State v. Rowe*, 252 Kan. 243, 251, 843 P.2d 714 (1992).

Seacat argues that the trial court abused its discretion in determining that Vashti had no incentive to distort or falsify statements. He presents several cases from other states and from a federal district court holding that parties in divorce proceedings may attempt to fabricate evidence in order to improve their image when contesting property division or custody of children. See, *e.g.*, *Hutchcraft v. Roberts*, 809 F. Supp. 846, 850

17

(1992); *State v. Joy*, 155 Idaho 1, 14, 304 P.3d 276 (2013); *Commonwealth v. Sugrue*, 34 Mass. App. 172, 175, 607 N.E.2d 1045 (1993).

While common sense suggests that a spouse or a child might have incentive to lie in ascribing bad behavior to another party after divorce proceedings have commenced in order to put the other party at a disadvantage, the present case offers a somewhat different scenario. Vashti told other people that her husband was threatening to kill her and set the house on fire to make it appear that she committed suicide. She was subsequently killed, and the house was set on fire. Seacat implies that Vashti was planning her suicide, which she hoped for some reason to make appear to be murder on Seacat's part, a convoluted scheme that she would herself undo by leaving a suicide note.

If no death and fire had occurred, and Vashti had only sought to introduce the threats in the course of a divorce proceeding to make her husband appear dangerous and unstable, then Vashti's reliability might have been much more suspect. But the fact that she made the statements and was subsequently found dead in a burning house suggests either that she was telling the truth about the threats or that she was a supremely scheming and vindictive suicide victim who nevertheless chose to leave a suicide note absolving her husband of murder.

This court is in no better position than the trial court to decide whether the declarant had incentive to falsify or distort statements. *State v. Brown*, 220 Kan. 684, 688, 556 P.2d 443 (1976). The trial court did not abuse its discretion in concluding that Vashti was acting in good faith and without incentive to falsify information when she reported the threats to her friends and therapist.

The statutory exception also requires a showing that the statements were made at a time when the matter was recently perceived by the declarant and while the declarant's

18

recollection was clear and prior to the commencement of the action. Although the statements were obviously made prior to the "commencement of the action," which is to say, her death and the fire, the precise relationship of the time when Seacat made the threats and when Vashti repeated them to other people is unknown. Both the threats and the repetition of them occurred sometime after Vashti began counseling and preparation for a divorce, a period of 3 or 4 months before her death, and perhaps as little as several weeks before her death.

The evaluation of whether the State met the statutory requirements of recent perception and a fresh memory lay within the discretion of the trial court. See *State v. Broyles*, 272 Kan. 823, 839, 36 P.3d 259 (2001). In *State v. Berry*, 223 Kan. 566, 568, 575 P.2d 543 (1978), this court found no abuse of discretion in the admission of out-of-court statements made 8 days after the declarant witnessed an event. The court noted that the K.S.A. 60-460(d)(3) timeliness requirement differs from the requirement for other hearsay exceptions, in that the statement need not be made contemporaneously with the event or condition it narrates, describes, or explains. 223 Kan. at 568-69.

Similarly, in *Smith v. Estate of Hall*, 215 Kan. 262, 268, 524 P.2d 684 (1974), this court distinguished between the language in K.S.A. 60-460(d)(3) and the language in (d)(1) and (d)(2), which refer to contemporaneous observations and statements. The (d)(3) exception allows for "a considerable passage of time, so long as the statement was made at a time when the event could still be reasonably classified as 'recent' and the declarant's memory was still unclouded." 215 Kan. at 268.

In *State v. Robinson*, 293 Kan. 1002, 270 P.3d 1183 (2012), this court held that a murder victim's statements to her friends in the months preceding her murder concerning her relationship with the defendant were admissible under a hearsay exception for contemporaneous statements and statements admissible on grounds of necessity. The

statements were made when the victim had recently perceived the events and while her recollection was clear, and there was no evidence suggesting the victim made the statements in bad faith or with an incentive to lie or distort the facts. 293 Kan. at 1025-26.

Although we do not know the exact timing of the threats and of Vashti's reports of those threats, the trial court properly considered the timing issue and relied on evidence before it that it obtained from the preliminary hearing to conclude, without abusing its discretion, that the statements were recent with respect to the reported events. Vashti's sister testified that the dream had "just occurred" when Vashti recounted that Seacat had awakened from a dream in which he killed her. The social worker's notes mentioned a threat by Seacat, and these notes were taken within weeks of the fatal event. Other witnesses located the reported threats within a couple of months or several weeks before her death. The period of time between the threats and Vashti reporting the threats would have been no more than 4 months and was probably just a matter of days. This was a short enough time period for the trial court to conclude that her memory of the event was fresh and clear and that the event was recently perceived by Vashti.

## II. EVIDENCE OF PRIOR SUICIDAL EVENTS

In order to bolster his theory that Vashti's death was a suicide, Seacat sought to testify that she had attempted or contemplated suicide on five prior occasions. The State filed a pretrial motion seeking exclusion of testimony about prior suicide attempts. At a motions hearing, the district court held that the previous suicide incidents were too remote in time to be relevant to the defense. Seacat argues on appeal that the district court erred to the prejudice of his defense when it excluded evidence of those incidents.

When a criminal defendant claims that a district court interfered with his or her constitutional right to present a defense, this court reviews the issue de novo. *State v.*

20

*Roeder*, 300 Kan. 901, 927, 336 P.3d 831 (2014). In *State v. Engelhardt*, 280 Kan. 113, 138-40, 119 P.3d 1148 (2005), this court analyzed a mixed issue of admissibility both for abuse of discretion and de novo for violation of a constitutional right. Under either standard, we find no error.

A defendant's right to present evidence in support of a defense is subject to certain restraints:  the evidence must be relevant, and evidentiary rules governing admission and exclusion of evidence are applied. *Roeder*, 300 Kan. at 927. While the exclusion of evidence that forms an integral part of the defendant's theory of the case can violate the defendant's right to a fair trial, the defendant's right to present a defense is subject to the rules of evidence and caselaw on the subject. *State v. Bridges*, 297 Kan. 989, Syl. ¶¶ 2, 3, 306 P.3d 244 (2013).

The district court granted the State's motion to exclude evidence of the oldest suicide ideations, in part because they were "too remote in time to be relevant at all" and in part because there was "no independent verification of those incidents or objective proof of them." The court provisionally denied introduction of alleged 2007 and 2008 incidents, subject to further proffers by Seacat. In a subsequent order, the court concluded that the 2007 and 2008 incidents were too remote in time and the evidence was too tenuous to support the conclusion that Vashti was disposed to commit suicide on April 30, 2011.

In *State v. Baker*, 281 Kan. 997, 135 P.3d 1098 (2006), this court considered a situation in which the victim had been on a suicide watch approximately 3 years before his death. The court reasoned:

"The security guard's testimony regarding Gerard's state of mind approximately 3 years before his death is too remote or tenuous to establish Gerard's state of mind at the time of

21

his death. Gerard had experienced a major change in his life since the security guard had observed him. Gerard had gotten married and moved out of the assisted care center into his wife's home. The security guard did not maintain contact with Gerard and could not testify about Gerard's state of mind at the time of his death. *Because the security guard's testimony did not address Gerard's state of mind at or near the time of his death, we conclude that the testimony was not relevant to prove that Gerard was suicidal on the day he died.* The trial court properly excluded the testimony from the security guard because it was irrelevant." (Emphasis added.) 281 Kan. at 1009.

In *State v. Drach*, 268 Kan. 636, 1 P.3d 864 (2000), this court considered a similar case in which the defense argued that a death was the result of suicide, not murder. This court held:  "In prosecutions for homicide a deceased's declarations or threats indicating a suicidal disposition, *if made within a reasonable time before his or her death*, are not within the hearsay rule and are admissible unless the facts preclude the possibility of suicide." (Emphasis added.) 268 Kan. 636, Syl. ¶ 1.

To be sure, Kansas law favors the admission of otherwise relevant evidence, and the exclusion of relevant evidence is an extraordinary remedy that should be used sparingly. *State v. Carr*, 300 Kan. 1, 214, 331 P.3d 544 (2014). The evidence at issue here, however, is of such dubious relevance that it would not have aided the jury in reaching a verdict.

The *Baker* and *Drach* courts held that antiquated suicidal behavior was not relevant to proving a suicidal state of mind. See *Baker*, 281 Kan. at 1009; *Drach*, 268 Kan. 636, Syl. ¶ 1. In the present case, Seacat would use purported suicidal ideations that were at least 3 years in the past to contest the abundant evidence presented by the State showing that Vashti's state of mind had improved dramatically over the course of the last year, that she was looking forward to her future and was making plans about which she

22

was excited, and that she explicitly stated, close to the time of her death, that she would not consider suicide because of her religious convictions and because of her concern for her children.

Excluding evidence of past suicidal events did not prevent Seacat from testifying about Vashti's state of mind around the time of her death. He testified that she was depressed and that she asked him questions about how one might commit suicide using a firearm. This evidence was not excluded, because it was relevant to her current state of mind. It served to rebut the State's evidence showing that Vashti was optimistic, upbeat, and opposed to suicide in the months preceding her death. Seacat was not precluded from asserting his defense theory.

Relevant evidence must be both probative and material. Whether evidence is probative is reviewed under an abuse of discretion standard. The trial court reasonably determined that Seacat's testimony regarding Vashti's prior suicide events was not probative because her past mental condition was not at issue. In light of *Baker* and *Drach*, the district court did not abuse its discretion in excluding that evidence.

## III. EVIDENCE THAT THE HORMONE HCG MAY INDUCE DEPRESSION

Seacat sought to introduce evidence that a hormone that Vashti may have been taking had a side effect of depression. The district court refused to admit that testimony. Seacat contends on appeal that the exclusion of the medical opinion evidence was erroneous and it was prejudicial to his theory that Vashti's death was a suicide.

The admission of expert testimony is generally reviewed under an abuse of discretion standard. *In re Care & Treatment of Girard*, 296 Kan. 372, 376, 294 P.3d 236 (2013). This standard is applied specifically with regard to the exclusion of expert

testimony relating to depression. *State v. Bridges*, 297 Kan. 989, 996, 306 P.3d 244 (2013).

Several witnesses testified that Vashti had used a hormone called human chorionic gonadotropin (HCG) as part of a regimen through which she lost a significant amount of weight. Those witnesses did not testify about when she last took the hormone, the frequency with which she took it, or the dosage that she was ingesting.

Seacat sought to introduce testimony through two different physicians that the Physicians' Desk Reference Manual (PDR) indicated that depression was a possible side effect of the hormone. The defense theory was that Vashti was depressed and committed suicide, and testimony regarding the hormone's side effect was intended to bolster Seacat's case by suggesting to the jury that it was likely that her use of the hormone made it more likely that she would be depressed.

Seacat proffered evidence to the trial court that Vashti had prescriptions for the hormone during the year before her death. He was not able to demonstrate, however, what the frequency and the dosage was, or how close in time to her death her last use was. At the pretrial motion in limine, the trial court provisionally ordered that testimony relating to the hormone use or its possible depressive effects would be admitted, subject to the conditions that the defense lay appropriate factual foundations and provide relevant medical testimony.

At trial, Seacat attempted to obtain testimony from the coroner during cross-examination that the PDR is a source on which physicians rely and that the PDR notes that depression can be a side-effect of the hormone that Vashti had received as a prescribed drug during the year before her death.

The court allowed an examination of the coroner outside the presence of the jury and then ruled that Seacat's line of questioning was improper. The court noted that the coroner had no expertise in endocrinology, had no specific expertise in the effects of the hormone, and had no information about Vashti's history of depression or moods. The court further noted that Seacat had provided no proof that Vashti actually used the hormones or when that usage might have taken place and had provided no link between the hormone's possible side effect and Vashti's actual mental state. The court then held the testimony inadmissible as irrelevant and not specific with respect to the coroner's findings about Vashti's death.

The court informed Seacat's attorney that it would consider allowing evidence regarding the side effects of the hormone only if the defense provided an expert who would be qualified to testify about the specific effects of the hormone on Vashti. The court concluded, "Without you telling me that there's a significant medical likelihood that she was on it and that it potentiated or exacerbated the alleged depression six months earlier, it's not coming in."

Seacat did not comply with the court's conditions for admitting the evidence. He proffered no additional proof of what amount she might have used or how recently she might have used it. He also did not seek the testimony of an expert who would have been able to give the jury useful information about the likelihood that the hormone would have induced suicidal depression under the circumstances of Vashti's use.

The only authority that Seacat sought to invoke at trial was the PDR. In *Crooks v. Greene*, 12 Kan. App. 2d 62, 736 P.2d 78 (1987), our Court of Appeals determined that the PDR was insufficient, standing alone and without supporting expert testimony, to establish consequences resulting from the ingestion of pharmaceuticals. We agree.

Speculative evidence is inadmissible. *State v. Bornholdt*, 261 Kan. 644, 666-67, 932 P.2d 964 (1997). A trial court has the responsibility of ensuring that speculative and problematical evidence does not reach the jury. *Butler v. Westgate State Bank*, 226 Kan. 581, 582-83, 602 P.2d 1276 (1979); see *State v. Berriozabal*, 291 Kan. 568, 588, 243 P.3d 352 (2010) (evidence of victim's prior sexual abuse was "too vague, speculative, and uncorroborated to be probative"; district court did not abuse discretion in excluding it); *State v. Tyler*, 251 Kan. 616, 631-32, 840 P.2d 413 (1992) (evidence of defendant's dreams too speculative to be admitted to show defendant's state of mind). The evidence of Vashti's hormone use and its effects on her mood was so lacking in foundation that it must be regarded as exceptionally speculative. Exclusion of the evidence did not constitute abuse of discretion by the trial court.

## IV. EVIDENCE THAT VASHTI WAS USING MARIJUANA

The trial court did not allow Seacat to testify that Vashti had been using marijuana as a means of coping with depression. He contends that the exclusion of that evidence undermined his defense.

At a pretrial motions hearing, Seacat made a vague proffer of evidence that Vashti had at some time in the past used marijuana. The proffered evidence allegedly supported his argument that she was depressed; he intended to argue to the jury that she was depressed at the time of her death and use of marijuana can be a sign of self-medication for depression.

The trial court granted the State's motion to bar the introduction of evidence of Vashti's purported marijuana use. The court held that the evidence was in no way relevant or probative and pointed to the lack of autopsy chemical evidence that she had used

26

marijuana within 30 days of her death. Whether the evidence was probative is reviewed for abuse of discretion. *Bridges*, 297 Kan. at 996.

The coroner's report showed no sign of recent marijuana use. Seacat proffered no expert testimony that might have demonstrated that marijuana use in general or by Vashti in particular would be symptomatic of depression. Seacat would have this court accept on face value the proposition that marijuana users have a statistically significantly greater probability of committing suicide, and the court is to accept that proposition without any proffer of how much marijuana she allegedly was smoking or any time frame for the use. The evidence of her marijuana use lacked any probative value; it could serve no purpose other than to invite speculation about and possible negative evaluation of the victim's character. The trial court did not err in excluding Seacat's testimony about Vashti's use of marijuana.

## V. THE MOTION TO STRIKE A WITNESS' STATEMENT REGARDING SEACAT'S NARCISSISM

During cross-examination of a prosecution witness, the witness provided an answer that somewhat exceeded the scope of the question. The trial court overruled Seacat's objection and motion to strike the answer. Seacat contends on appeal that the trial court erred in overruling his objection and that the error was prejudicial to his defense.

As with other evidentiary issues addressed above, the standard of review here ultimately is whether the trial court abused its discretion. See, *e.g.*, *State v. Lloyd*, 299 Kan. 620, 631, 325 P.3d 1122 (2014) (no abuse of discretion in refusing to strike trial testimony); *State v. Montanez*, 215 Kan. 67, 73, 523 P.2d 410 (1974) (no abuse of discretion in striking witness' entire testimony).

During the cross-examination of Jill Aaron, a friend of Vashti's and a witness for the State, the following dialogue took place:

"Q. . . . And when you had this conversation with Vashti about her concerns filing for the divorce, she specifically told you that she was concerned that Brett would take the boys and run away because he had said he was going to, correct?

"A.    Yes.

"Q.    She never indicated any concerns, that you communicated to the police at least, for her physical safety, correct?

"A.    No, she was just scared because of his narcissistic ways.

        "MR. FALK:  Objection. Ask that last part of the answer be stricken, Your Honor.

        "MS. DOMME:  Judge, it was –

        "THE COURT:  Wait a minute. Why?

        "MR. FALK:  Not responsive to the question asked.

        "THE COURT:  Overruled.

"BY MR. FALK:

"Q.    You didn't say anything about any narcissistic tendencies to the police, did you?

"A.    I did tell them that he was narcissistic."

On appeal, Seacat maintains that Aaron's reference to Seacat's narcissism was outside the scope of the question and constituted a prejudicial negative character evaluation.

We initially consider whether the answer given was improper. Aaron stated that she did not tell the police about any concerns for Vashti's safety, but the witness added that Vashti was scared and Vashti was scared because of Seacat's narcissism. The testimony went to Vashti's fear and the basis of that fear, and the evidence of Seacat's character was incidental to Vashti's subjective concerns. Aaron answered the question

28

and then expanded on her answer to the question. Her explanation included a reference to Seacat's character.

Seacat frames his argument of impropriety in terms of K.S.A. 60-447, which governs evidence of character traits as tending to prove conduct on specific occasions. The statute explains:

> "[I]n a criminal action evidence of a trait of an accused's character as tending to prove guilt or innocence of the offence charged . . . if offered by the prosecution to prove guilt, may be admitted only after the accused has introduced evidence of his or her good character." K.S.A. 60-447(b)(ii).

Two factors undermine Seacat's argument. First, the testimony regarding his alleged narcissism was not offered to prove his guilt, and second, the evidence was not offered by the prosecution. The witness testified about Seacat's character not to prove his guilt but to explain Vashti's emotional reaction. It would be a leap of interpretation to invite the jury to find Seacat guilty of murder because he was alleged to be narcissistic, and the State did not attempt to make such a leap. The State also did not offer the evidence. To be sure, Aaron was a prosecution witness, but her testimony was elicited by Seacat's attorney as an expansive and relevant answer to his question.

Furthermore, we discern no prejudice resulting from the answer. The burden is on the defendant to show that an improper answer to a question resulted in substantial prejudice to the defendant. *State v. Campbell*, 268 Kan. 529, 538, 997 P.2d 726 (2000). Given the wide variety of evidence about Seacat's threats and behavior, as well as the forensic evidence from the crime scene, it is unlikely that the jury based its verdict to any significant degree on the single statement by the prosecution witness. Seacat testified, and

29

the jury had some opportunity to make its own evaluation of Seacat's character and alleged narcissism.

There was no error in the admission of Aaron's statement, and the statement did not result in prejudice to Seacat's right to a fair trial.

Because we have determined that no errors were committed, the cumulative error doctrine that Seacat advances does not apply. See, *e.g.*, *State v. Lowrance*, 298 Kan. 274, 298, 312 P.3d 328 (2013).

The trial court did not err in its evidentiary rulings. The conviction is affirmed.

\* \* \*

JOHNSON, J., concurring:  I concur in the result reached by the majority because I perceive that, even if defendant had obtained a favorable ruling on the evidentiary matters he challenges in this appeal, the verdict would have been the same. I write separately because I do not agree with all of the majority's evidentiary holdings, especially where it allows the *weight* of the evidence to influence its assessment of the *admissibility* of the evidence.

First, I do not agree with the majority's characterization of the victim's question to Joy Trotnic, to-wit:  "Do you think Brett would burn the house down with me in it?" The majority opines that the utterance was not a hearsay statement because it sought Trotnic's opinion. But Trotnic's precrime opinion as to what the defendant might or might not do in the future was not relevant to the question of what defendant actually did or did not do, *i.e.*, Trotnic's opinion was not relevant evidence of defendant's guilt. What makes the utterance relevant in this criminal prosecution is the victim talking about the defendant

30

burning down their house with her in it, which was the precise event that subsequently occurred. In other words, the out-of-court question was proffered for the truth of the matter forming the basis of the query.

Under the majority's rationale, any hearsay statement could be rendered admissible if the witness simply says that the declarant posed the statement as a question. For instance, testifying to the out-of-court statement,"my neighbor smokes marijuana," would be hearsay. But the majority would apparently find that it would not be hearsay if posed as the out-of-court question, "would you believe that my neighbor smokes marijuana?" Such a technical distinction would undermine the purpose of the hearsay rule and would elevate form over substance. I would find that the opinion request was irrelevant and that the factual predicate of the request was hearsay.

Most importantly, however, I disagree with the majority's determination that the victim's multiple prior suicide attempts or ideations were not relevant to the defense theory that the victim committed suicide. Statutorily in this State, "relevant evidence" is defined as meaning "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). We have noted that our statutory definition resembles Federal Rule of Evidence 401: "'"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *State v. Reid*, 286 Kan. 494, 504, 186 P.3d 713 (2008). Moreover, our caselaw declares that "'[r]elevance is established by a material or logical connection between the asserted facts and the inference or result they are intended to establish. [Citation omitted.]'" *State v. Burnett*, 300 Kan. 419, 427, 329 P.3d 1169 (2014) (quoting *State v. Ultreras*, 296 Kan. 828, 857, 295 P.3d 1020 [2013]).

31

The result intended to be established was that the victim committed suicide, and the asserted facts to establish that result were that the victim had previously attempted or considered suicide and that the victim had suffered from depression. Logic would suggest, and I strongly believe that the science would confirm, that prior suicide attempts, especially when coupled with a diagnosis of depression, are indicia of a suicide risk. Consequently, the fact that the victim had previously attempted or contemplated suicide would make it more probable that the victim died from suicide than if the victim had never attempted or contemplated suicide in the past.

The majority declares that past precedent establishes "that antiquated suicidal behavior [is] not relevant to proving a suicidal state of mind." The fundamental flaw in that declaration is that the defendant does not have to prove that the victim possessed a suicidal state of mind. The State has to prove that the death was a homicide; the defendant just has to come forward with evidence of a defense that casts a reasonable doubt on the State's proof. Moreover, the relevance of the proffered evidence of prior suicidal behavior cannot be assessed in a vacuum, but rather that evidence must be viewed in the context of the other evidence suggesting a risk of suicide. Here, the evidence before the jury included the victim's personal journal containing a suicide note and a therapist's testimony that the victim began counseling with symptoms of depression. In that context, the fact that the victim had previously attempted and/or thought about attempting suicide is a relevant piece of information for the jury to possess.

The majority suggests that the defense should not be able to use weak evidence of prior suicide attempts or ideations

> "to contest the abundant evidence presented by the State showing that Vashti's state of
> mind had improved dramatically over the course of the last year, that she was looking
> forward to her future and was making plans about which she was excited, and that she

explicitly stated, close to the time of her death, that she would not consider suicide because of her religious convictions and because of her concern for her children."

In my view, the majority outlines what would be a good closing argument for the State to make as to why the jury should believe that the victim's death was a homicide and not a suicide. But even in the face of an overwhelming quantity of highly compelling State's evidence, the court must admit relevant defense evidence, notwithstanding the court's assessment of the relative weakness of the defense evidence. The jury is to weigh competing evidence. Neither the relative weight of the proffered evidence nor its equivocal nature is part of the formula for determining its admissibility. *Cf. Schlatter v. Ibarra*, 218 Kan. 67, Syl. ¶ 7, 542 P.2d 710 (1975) (uncertain witness testimony qualified by phrase expressing less than positive degree of assurance does not affect admissibility of evidence, although probative force thereof may be affected). For instance, here, the jury was entitled to weigh the therapist's testimony that the victim said she would never commit suicide because of her religious convictions and her children against the defendant's testimony that the victim had previously attempted suicide.

In short, I would find that the victim's prior suicide attempts and ideations were relevant to the defense theory that the victim committed suicide and that evidence should have been admitted. Nevertheless, in the face of the other evidence, I am convinced that if the excluded evidence had been given to the jury, it would still have convicted the defendant.

LUCKERT, J., joins in the foregoing concurring opinion.

33