IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,105

STATE OF KANSAS,
*Appellee*,

v.

TRIA L. EVANS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Hearsay is evidence of a statement made by someone other than the witness testifying at the hearing when that statement is offered to prove the truth of the matter stated.

2.

Hearsay testimony is inadmissible unless it fits within one or more of the K.S.A. 2020 Supp. 60-460 statutory exceptions.

3.

The basis of the hearsay rule is that, when a statement is introduced as evidence for the truth of the matter asserted, the declarant's credibility is the basis for its reliability, and the declarant must be subject to cross-examination.

4.

If an out-of-court statement is offered for some reason other than to prove the truth of the matter stated, it is not hearsay.

1

5.

The unavailable witness exception to the hearsay rule, set out in K.S.A. 2020 Supp. 60-460(d)(3), allows for the passage of a considerable duration of time, so long as the out-of-court statement was made at a time when the event could still be reasonably classified as recent and the declarant's memory was still unclouded.

6.

Evidence of prior crimes or civil wrongs that is admissible under K.S.A. 2020 Supp. 60-455(b) must also meet the K.S.A. 2020 Supp. 60-460 requirements for admissibility if the evidence qualifies as hearsay.

7.

Evidence of motive may legitimately provide a jury with some degree of explanation, responding to a juror's natural tendency to wonder why a defendant behaved in the manner described by the State.

8.

Plan evidence is admissible under either of two theories: first, that there is some direct connection between the earlier conduct and the crimes charged. In such a case, since the two events are causally connected, proving the defendant's involvement in the earlier incident logically tends to establish the defendant's involvement in the charged crime as well. Under the second theory, the two events do not have to be directly or causally connected, but the method of committing the prior act must be so similar to the method used in the charged crime that it is reasonable to conclude that the same individual committed both acts.

9.

While all evidence that is derogatory to a defendant is by its nature prejudicial to the defendant's claim of not guilty, evidence that actually or probably brings about the wrong result under the circumstances of the case is unduly prejudicial.

10.

A district court's decision under K.S.A. 2020 Supp. 22-3429, whether to order a mental evaluation, is reviewable for abuse of discretion.

11.

A valid motion should state the relief sought and specify the basis for the requested relief.

Appeal from Douglas District Court; BARBARA KAY HUFF, judge. Opinion filed August 6, 2021. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jon Simpson*, assistant district attorney, argued the cause, and *Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Tria Evans appeals from her convictions by a jury of first-degree murder, conspiracy to commit first-degree murder, arson, and aggravated burglary. She challenges the admission of particular evidence at trial and also raises a sentencing issue.

FACTS

Evans and Joel Wales began dating in 2013. In February 2014, Evans gave birth to a daughter. After the daughter was born, Evans became jealous of Joel's time, especially in light of his desire to spend time with their daughter. According to a coworker, his daughter was Joel's "main priority." Debra Wales, Joel's mother, testified, "If he wasn't with [Evans], then she had to know where he was at. She was . . . following him, sitting outside his house, sitting outside our house, sitting outside his job sites, showing up at places where he might be with friends." Evans was jealous that Joel wanted to spend time with their daughter but not with her; and, because Joel was trying to end the romance, she would use the daughter "as a pawn to try to get Joel to come to her house." Sometime in 2017, Debra obtained a no-trespass order against Evans for the purpose of keeping her away from Debra's house.

More often than not, Evans would fail to bring the daughter for court-ordered visitation. Joel filed at least a dozen police reports on account of Evans' failure to meet for visitation. Toward November 2017, Evans was becoming more and more recalcitrant about visitation.

At some point as her relationship with Joel deteriorated, Evans contacted her former husband, Jacob Legleiter, and told him that she would like to obtain a gun. She asked him what kind she should buy, and he told her a .38 would be a good match for her body size.

Donald Love "sort of dated" Evans around that time and reported that she had a favorite spot at Lake Perry where she liked to hang out. She sometimes told him that Joel was abusing her or stalking her and she feared for her life. She also told him she had a

gun. At trial, he testified that "she had actually asked me to kill [Joel] a couple of times," a request that he found distasteful.

Joni (Garner) Sidney became friends with Evans after the two met at a pregnancy care center. For a while, Evans would go to Sidney's house every weekday, where she would "non-stop" call Joel. Evans always wanted to be with Joel, but that desire was not mutual. Evans told Sidney that she always knew where Joel was and that she was very jealous of Joel and everyone he worked with, insisting that Joel was having an affair with an office worker at his job. She was also jealous of Joel's good relationship with his mother and with his daughter.

Evans often talked about obtaining protection-from-abuse orders against Joel. Evans told Sidney she was going to get a restraining order "[to] make Joel mad," but she confided that the grounds for the protective orders were false. She also told Sidney she wanted to build a case that Joel was sexually molesting their daughter, but, when Sidney said she knew that was not true, Evans admitted she had no evidence to support the claim.

Around the beginning of 2017, Evans started talking to Sidney about wanting to kill Joel. Evans told her, "I want to kill the motherfucker." She also talked about wanting to kill Joel's mother. Sidney testified, "She first asked if I would be willing to shoot his mom and Joel, and then she said that she was asking other people to do the same thing and offering money." According to Sidney, sometime in April, Evans "asked me point blank if I would . . . shoot Joel's mother and if I would shoot Joel. And she said that she would drive me to their house, and we could use my car because nobody knows my car. And she was asking me because I don't know these people, there would be no way to connect her to me doing it. She said that she would pay me $500 to start, and then afterwards she would give me 500 more dollars." Sidney further testified, "She told me that she would give me a gun, and that I would go to the door and ring the doorbell, and

5

when his mother answered, that I would shoot his mother." She then said "she wanted to set the house on fire. She wanted to 'burn the motherfucker down.'"

After Sidney declined this request to commit or assist in committing these homicides, Evans went to Dodge City to meet with someone named Tyrel about killing Joel. Evans told Sidney that Tyrel was a recovering addict and she would pay him with methamphetamine to carry out the murder. On June 20, 2017, Evans sent a text reading: "Tyrel, just between me and you please please please tell me where I can get an untraceable tasteless poison." She later sent messages to the same number reading: "I'm not fucking around"; "This is serious"; and "Come on help me out." Evans also talked to Sidney about someone named Frank who was a candidate for carrying out the murder.

After Sidney told Evans that she was starting to date a mutual acquaintance of theirs, the friendship came to an end. Although Evans was initially cordial and thanked Sidney for telling her about the new relationship, she started a social media hate campaign against Sidney and started calling her phone "non-stop" and driving by her house "non-stop." Sidney eventually had to change her telephone number in order to end the calling.

Over renewed objections from Evans, several of Joel's former coworkers testified at trial about the relationship between Evans and Joel. Joel worked for a business that installed commercial heating and air conditioning units. Evans frequently showed up at job sites, despite Joel directing her not to. Even after job supervisors told her not to come to the sites for safety reasons, she would park across the street or drive by while the workers were on the job. This happened at least once a day and almost every day. Evans would typically call Joel 50 to 60 times a day and would send him between 100 and 200 text messages a day. Data recovered from Evans' phone showed that, from May 1 to August 1, 2017, Evans sent Joel 978 text messages; he sent her 195.

One of Joel's coworkers reported that he sometimes was able to overhear Evans speaking on the phone when Joel was at work, and she would accuse him of not really being at work or having sex with someone else. She also left messages telling Joel that, if he failed to contact her, he would not be allowed to talk with his daughter.

Evans drove a distinctive blue Ford Taurus, and she would show up at company headquarters in the morning and follow Joel to a job site, or sometimes she would just show up at the site. When he first began to try to disengage from the relationship, she followed Joel almost every day, and, later, a couple of times a week. Once, as she was following them on their way to lunch, she called Joel and told him she could see "that bitch in the back seat that you're screwing," an individual who was actually a male coworker. She would also sometimes follow the workers to lunch, and Joel occasionally sat with her, mainly when she brought their daughter along.

Joel told a coworker, Mitchell McClelland, that Evans had a gun and had pointed it at him. On one occasion, Joel played for his coworkers McClelland and Jasen Hadl a voicemail that Evans had left him in which she threatened to shoot him and herself. Hadl remembered her words being, "If you don't answer your phone, and you don't want to be with me, I will end up shooting you." On another occasion, while Joel was working, she left a message on his phone, overheard by Hadl, stating: "You guys are sitting there threatening me when I'm sitting across the road. I could just go ahead and shoot you all." In May, 2017, Joel told coworker Darin Hermann, "I'm afraid she's going to shoot me," and told coworker David Razo that she threatened to kill him. Joel frequently told Hadl, "'If there's ever a time that I'm not around here anymore, the bitch shot and killed me.'" His comments to this effect became more frequent toward the end of October and the beginning of November 2017.

7

Joel and his father lived in a house in Eudora when Joel's relationship with Evans deteriorated. The father had placed a trespass warning against Evans, and Joel renewed it after his father died. Law enforcement served the warning on Evans, and a court order, effective as of August 10, 2017, prohibited Evans from having any contact with Joel, other than in writing.

Christina Towell was a cousin and friend of Evans. The two spoke on the phone and texted frequently, and over time, Joel became the center of their conversations. On October 13, 2017, Evans sent Towell a text message reading: "It's either him or us." Towell replied: "Yeah it'll be him."

On the morning of November 3, 2017, Joel's coworker Razo was leaving Eudora when he passed Evans driving toward Eudora. He called Joel, who said he was at his mother's house and Evans had just left there. Joel told him he and Evans had been in a fight. That evening, Towell sent a message to Evans asking: "Address?" Evans responded: "202 Alabama Street." At 8:11 p.m., Evans texted Towell: "When you coming." Towell responded at 8:15 p.m.: "Now." There was no other activity on the phone between 8:15 p.m. and 10:43 p.m., when Towell called Evans.

Towell went on a long drive the night of November 3. Her route was recorded by a GPS device in her car and by both private and city surveillance cameras and license-plate detectors. According to Towell's son, his mother left for Lawrence around 8 p.m. in the evening driving her red Mustang. GPS data showed that a car left Towell's Leavenworth address at 8:12 p.m., drove through Lawrence, and arrived at Evans' address at 202 Alabama Street at 8:52 p.m. Variations in house-light and headlight intensity picked up by surveillance cameras suggested someone left Evans' house and got in the red car that showed up at Evans' house. At about the same time, the light on Evans' car blinked on and off as if her car were being remotely locked.

8

At 9:06 p.m., video footage showed the red car leaving Evans' house, the same time that Towell's GPS device showed that her car left Evans' address. The car went to a gas station, where it stopped briefly, and then drove south on Highway 59. Cameras at intersections on Highway 59 in Lawrence tracked a red car with Towell's license plate heading south at the same times as the GPS tracked Towell's car. GPS tracking showed the car drove south of Lawrence and past Debra's house about half a mile, turned around in a driveway, and then pulled up and stopped at the driveway of Debra's house at 9:30 p.m. The car remained there for 3 minutes and 40 seconds.

Monique Jaimez and Jenna Bloom were neighbors of Joel's mother in rural southwest Douglas County. Around 9:30 p.m. on November 3, Jaimez stepped out on her front porch and heard a woman yelling. A series of gunshots followed. A few seconds later, Jaimez heard a second series of gunshots. She saw a woman open the front screen door of the neighbor's house and run across the porch to a car in the driveway. Then the woman turned around and went back into the house.

Jaimez could see the woman moving around in the house. The woman went back to the car one more time, then back to the porch, and Jaimez saw her swing her arm. Immediately afterwards, a wall of fire rolled across the front room all the way to the front door. The woman then ran out to the driveway and got in the passenger side of the car, which shot out the driveway and headed north in the direction of Lawrence. Jaimez did not get a good look at the woman but could see she was skinny and had hair past her shoulder. She described the car as "dark-colored" but said she did not get a good look at it. Because Jaimez saw the brake lights tap just before the woman got in the passenger side, she thought it was probable that someone else was driving the car.

9

Bloom joined Jaimez in watching the events. She also heard a woman yelling and then heard two sets of shots. She saw the woman make a throwing motion, which was when the fire roared across the front room. She too saw the woman get in the passenger side of the car. At 9:35 p.m., Bloom called 911 to report the shots and the fire.

GPS data showed that the car at the crime scene took a different route back to Evans' house, where it arrived at 9:55 p.m. Surveillance camera footage showed that the red car left Evans' house at 9:59 p.m., and GPS data showed it arrived back at Towell's address in Leavenworth later that night. Towell's son testified that his mother arrived home that evening at around 11 p.m.

At 11:57 p.m. that night, Evans sent her occasional partner Donald Love a text informing him she was leaving Lake Perry and would like to stop by to visit him. Although Joel's cell phone was never recovered, law enforcement was able to trace the phone's location to Jefferson County, in the vicinity of Lake Perry, and determined that it was last active shortly before 11 p.m. on November 3.

Based on his previous knowledge about the couple's discordant relationship, upon hearing from sheriff's dispatches of the shooting at Debra's home, a Lawrence police officer decided to stake out Evans' house that same night. He arrived there around 10:20 p.m., and at, about 12:20 a.m., he saw a blue Ford Taurus sedan drive down the street and pull into the driveway, where a white woman with blonde hair got out of the car and went in the house. A sheriff's office detective then relieved him, and, at 1:30 a.m., the detective went to the house to determine whether Evans' minor children were all right. Evans was awake when he went to the door and told him the children were with her mother, which the detective subsequently confirmed through a personal visit.

At the scene of the shooting, three cartridge casings were found inside the house and three more were eventually found outside. There were three bullet holes in the screen door. From blood stains on the floor, it appeared Joel had been shot as he was standing immediately inside his front door. The coroner determined that Joel had received a total of six gunshot wounds to the head and torso, any one of which could have been fatal. He determined that some of the bullets had passed through glass before striking Joel. He also determined that Joel was dead before the fire was set.

A forensic scientist determined that the cartridge casings from the crime scene were manufactured by PerFecta for a .380 caliber automatic firearm. The markings on the bullets were specific to Smith & Wesson, and the only .380 automatic gun that company produced was the Bodyguard. Like the coroner, the scientist concluded that some of the bullets had passed through glass before striking Joel.

On November 4, law enforcement obtained a warrant to search Evans' house. The ensuing search turned up an empty box for a Smith & Wesson .380 Bodyguard semiautomatic gun and an empty magazine clip that would hold six bullets. The missing gun was never found. Law enforcement officers also recovered a phone from Evans' purse, which would provide data about text exchanges relating to Joel and Towell.

A law-enforcement dog alerted for accelerants at locations on the porch and around where Joel's body was found. Samples taken from all those places subsequently tested positive for gasoline. A Fire Marshal's investigator determined that, because the doors and windows to the house were closed, the fire lacked a ready oxygen supply and burned itself out relatively quickly.

Based on license tag data, law enforcement identified Towell's car and made her a suspect in the shooting. A search of her residence and car in Leavenworth revealed a

nearly empty gas can in the back of her car. The search also turned up an envelope addressed to Towell containing a handwritten note and a photograph of Joel. The note read: "Joel Wales, 2 Sharps Court, Eudora. Shaved military haircut. Long ugly beard. Drives junk maroon old Mustang. Piece of shit friends. Will Walks. Todd and Stephanie Rodman. Mother—Debbie Wales. Dad deceased." In the top corner, the note read: "6' 4", 240 pounds." An expert forensic document examiner reached the "definitive conclusion" that Evans wrote both the address on the envelope and the note it contained. A latent thumb print identified with Evans was also found on the note, and DNA consistent with Evans' DNA was recovered from the inside flap of the envelope. In addition, law enforcement confiscated Towell's phone, from which they recovered text messages relating to Joel and Towell's relationship with Evans.

A week after Joel's death and on the day of his funeral, GPS tracking showed that a car left Towell's address in Leavenworth, proceeded to Evans' address, then drove by the crime scene and past the area of the cemetery where Joel was being buried.

In January 2018, the State filed an information charging Evans with one count of premeditated first-degree murder, one count of conspiracy to commit first-degree murder, one count of arson, and one count of aggravated burglary. A jury found Evans guilty of all four charges. The court sentenced her to a hard 50 life term for the murder conviction, and concurrent terms of 117 months, 18 months, and 41 months, for the other counts respectively. Evans filed a timely notice of appeal to this court.

*Discussion*

Numerous out-of-court statements and descriptions of Evans' conduct prior to the time of the crime were admitted into evidence. These were discussed at length in pretrial written pleadings and at a pretrial motions hearing. The trial court ended up allowing the

12

State to introduce most of the requested evidence over Evans' continuing objections and repeated specific objections at trial.

Before looking at the disputed evidence, it may be helpful to isolate the undisputed evidence. Evans emphasizes that the State's case was merely "circumstantial," but the circumstantial evidence of her guilt was quite strong, even without the evidence at issue below.

It was undisputed that Joel and Evans were closely connected and had a daughter together. Bullets fired from a Smith & Wesson Bodyguard semiautomatic firearm killed Joel, and an empty box for a Smith & Wesson Bodyguard semiautomatic firearm was found in Evans' house. GPS data and surveillance footage showed that Towell's red Mustang left Leavenworth and proceeded to Evans' house on the night of the shooting, and someone left Evans' house and got into the car's passenger seat. That car then drove to Joel's mother's house and was parked there for several minutes, during which time the shooting took place. A woman was angrily shouting at someone in the house, and then shots were fired from the front doorway into the house, killing Joel. The woman ran back to the car, then ran back to the house, made a throwing motion, and the house erupted in flames. The car then left Debra's house and returned to Evans' house, where someone got out of the passenger side and went in the house. Two eyewitnesses to the shooting gave descriptions of the perpetrator roughly matching Evans' appearance. A police officer observed Evans arrive back at her house late at night after the shooting. A nearly-empty gas can was found in the trunk of Towell's Mustang, and a note written by Evans was found in Towell's house; the note contained a description of Joel framed in angry, disparaging language.

This evidence might well have sufficed for a jury to find Evans guilty as charged. But the jury would have had to deal with several loose ends. In particular, there would

13

have been little context for the shooting and arson. The jury might have been skeptical that Evans spontaneously decided on the night of November 3, 2017, to drive with a friend to carry out the crimes without provocation or motivation. And, even with the challenged evidence, the defense argued that Evans was never explicitly identified as the shooter, the witnesses did not get a good look at the culprit, and there was no direct evidence showing that it was Evans who was in Towell's car when it arrived at Debra's house.

The challenged evidence served to tie up these loose ends. It showed an obsessive relationship in which Evans repeatedly threatened to kill Joel and sought help from others in carrying out that crime. This helped establish both motive and identity of the killer. The evidence also showed preparation and planning, including using a third party's vehicle that would not be readily identifiable and setting the house on fire to eliminate evidence of the crime.

A.      *The Hearsay Evidence*

The focus of this issue rests on statements that Joel made regarding threats that Evans made toward him, his mother, and coworkers, as well as Joel's statements that he feared for his life. On appeal, Evans seeks to include out-of-court statements that she made as part of her hearsay challenge, although, as the State points out in its brief, she did not challenge those statements as impermissible hearsay before or during trial.

Many of the statements, both written and spoken, attributed to Evans were admitted under K.S.A. 2020 Supp. 60-455(b), evidence of prior bad acts. The bad acts included criminal threat, criminal solicitation of others to commit murder, defiance of court-ordered restraining orders, and conspiracy to commit murder. We specifically discuss the admission of this evidence in a subsequent issue. But it must be remembered

14

that evidence of prior crimes or civil wrongs allowed under K.S.A. 2020 Supp. 60-455(b) must still pass the K.S.A. 2020 Supp. 60-460 requirements for admissibility if the evidence also qualifies as hearsay. *State v. Seacat*, 303 Kan. 622, 633, 366 P.3d 208 (2016).

An appellate court generally reviews a trial court's admission of hearsay statements for abuse of discretion. But when the adequacy of the legal basis of the court's evidentiary ruling is challenged, an appellate court reviews that ruling de novo. *State v. Randle*, 311 Kan. 468, 476, 462 P.3d 624 (2020). A judicial action constitutes an abuse of discretion when (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018).

In its pretrial pleadings and hearing, the State sought leave to introduce particular statements that Joel either made to coworkers or that were overheard by third parties to his conversations:

- Sidney overhearing Joel telling Evans over the telephone to leave him alone in a conversation that took place in early 2017.

- Joel asking Razo to check on Joel's residence in Eudora to determine whether Evans was still there because Joel said he was still at his mother's house and Evans had just left.

- Joel telling Razo that he and Evans had been fighting, and Joel asking Razo to make sure his daughter was taken care of if anything happened to Joel. Razo heard these statements in a telephone conversation with Joel on the day of the shooting.

15

- Joel telling Hadl about threats Evans made that she was going to shoot him. These threats were heard by Hadl in 2017.

- Joel telling coworker Hermann, after speaking with Evans on the phone, that he was afraid she was going to shoot him. Herman heard the statement in May 2017.

- Joel requesting a no-trespass order from Officer Michael Rubow of the Eudora Police Department on July 24, 2017.

Hearsay is "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2020 Supp. 60-460. Hearsay testimony is inadmissible unless it fits within one or more of the K.S.A. 2020 Supp. 60-460 statutory exceptions. The basis of the rule is that when a statement is introduced as evidence for the truth of the matter asserted, the declarant's credibility is the basis for its reliability, and the declarant must be subject to cross-examination. If an out-of-court statement is offered for some reason other than to prove the truth of the matter stated, it is not hearsay. For example, a statement offered to prove merely that the statement was made is not hearsay. *Randle*, 311 Kan. at 476.

K.S.A. 2020 Supp. 60-460(d) provides an exception for contemporaneous statements and statements admissible on grounds of necessity:

"A statement which the judge finds was made: (1) While the declarant was perceiving the event or condition which the statement narrates, describes or explains; (2) while the declarant was under the stress of a nervous excitement caused by such perception; or (3) *if the declarant is unavailable as a witness, by the declarant at a time*

16

*when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort*." (Emphasis added.)

Evans argues that the trial court erred in failing to find that the out-of-court statements were made without the intention to falsify them or that they were made in good faith. As she states in her appellate brief: "It is certainly plausible that Joel could have made these statements with intent to falsify and without good faith in order to continue building his case regarding custody of their daughter."

But there is no requirement of certainty in the statutory necessity exception. While it is indeed possible that Joel strung together an elaborate web of manipulative statements for the purpose of deceiving his coworkers into thinking that Evans was threatening him and interfering with his relationship with his daughter, that possibility does not translate into error in admitting the evidence. The trial court was not persuaded that such a scheme was afoot, and the witnesses were subject to cross-examination, with their credibility subject to weighing by the jury.

In *Seacat*, 303 Kan. at 635-37, this court considered the reliability of out-of-court statements made by a murder victim implicating the defendant through both open and veiled threats the victim reported to other people. The defendant argued that the victim was motivated to frame him as a murderer when she intended all along to commit suicide. This court held:

> "'[T]he presence or absence of an incentive to falsify or distort is a question of fact to be determined by the trial judge in light of all the circumstances.' [*State v. Hobson*, 234 Kan. 133], 158, [671 P.2d 1365 (1983)]. The appellate court is in no better position than the trial court to decide whether the unavailable witness had incentive to distort or falsify statements. *State v. Rowe*, 252 Kan. 243, 251, 843 P.2d 714 (1992).

17

. . . .

"While common sense suggests that a spouse or a child might have incentive to lie in ascribing bad behavior to another party after divorce proceedings have commenced in order to put the other party at a disadvantage, the present case offers a somewhat different scenario. [The victim] told other people that her husband was threatening to kill her and set the house on fire to make it appear that she committed suicide. She was subsequently killed, and the house was set on fire. Seacat implies that [the victim] was planning her suicide, which she hoped for some reason to make appear to be murder on Seacat's part, a convoluted scheme that she would herself undo by leaving a suicide note.

"If no death and fire had occurred, and [the victim] had only sought to introduce the threats in the course of a divorce proceeding to make her husband appear dangerous and unstable, then [the victim's] reliability might have been much more suspect. But the fact that she made the statements and was subsequently found dead in a burning house suggests either that she was telling the truth about the threats or that she was a supremely scheming and vindictive suicide victim who nevertheless chose to leave a suicide note absolving her husband of murder." *Seacat*, 303 Kan. At 635-36.

Much the same analysis may be applied to the present situation. Joel reported to coworkers that Evans threatened to shoot him in order to keep him from dating other women and to keep him from bonding with his daughter. This was consistent with her following him to job sites and obstructing his visitation with his daughter, and it was consistent with him eventually being shot. The out-of-court statements did not, in and of themselves, prove that Evans carried out her threats, but the evidence in its entirety was consistent in a way that supported finding the coworkers' reports reliable.

Evans also complains that it was not possible to determine with much certainty the time between Joel's statements and the events he was describing. For example, when he

18

told coworkers that Evans threatened to kill him, it was unclear whether he was referring to threats made that day or threats made some months earlier.

This court has not defined with particularity what is meant by "contemporaneous." Joel's quoted statements appear to have been made sometime during the year 2017, as the situation between Evans and him deteriorated. There was nothing proffered suggesting that he was referring to events in previous years.

In *State v. Robinson*, 293 Kan. 1002, 1025-26, 270 P.3d 1183 (2012), this court held that a murder victim's statements to her friends in the months preceding her murder concerning her relationship with the defendant were admissible under a hearsay exception for contemporaneous statements and statements admissible on grounds of necessity. The statements were made when the victim had recently perceived the events and while her recollection was clear, and there was no evidence suggesting the victim made the statements in bad faith or with an incentive to lie or distort the facts.

In *Smith v. Estate of Hall*, 215 Kan. 262, 268, 524 P.2d 684 (1974), this court distinguished between the language in K.S.A. 2020 Supp. 60-460(d)(3) and the language in (d)(1) and (d)(2), which refer to contemporaneous observations and statements. The (d)(3) exception allows for "a considerable passage of time, so long as the statement was made at a time when the event could still be reasonably classified as 'recent' and the declarant's memory was still unclouded." 215 Kan. at 268.

We find no error of law or abuse of discretion in the trial court's admission of Joel's out-of-court statements. The statements fit within the statutory exception to the hearsay rule for a witness who was unavailable; they were made under conditions tending to show they were reliable and they were made close enough in time to be considered contemporaneous.

19

B.      *The Evidence of Prior Bad Acts*

This issue relates to the first issue, in that the State introduced evidence of Evans' conduct and statements not specific to the actual events on the day of the crimes to show it was likely that she committed the crimes. Indeed, some of the out-of-court statements were also considered evidence of prior criminal conduct, such as making terroristic threats and soliciting others to commit murder.

In reviewing the admission of prior bad acts evidence under K.S.A. 2020 Supp. 60-455, an appellate court uses a three-step test. First, the court considers whether the evidence is relevant to establish a material fact at issue. Determining whether the prior bad acts evidence is material is subject to de novo review. Second, the reviewing court must determine whether the material fact is disputed and whether the material fact is relevant to prove the disputed fact. This determination by the district court is reviewed for an abuse of judicial discretion. Finally, the court must consider whether the probative value of the evidence outweighs its prejudicial effect. This step is also analyzed under an abuse of discretion standard of review. If prior bad acts evidence is admitted under K.S.A. 2020 Supp. 60-455 in a jury trial, a limiting instruction must be provided to inform the jury of the specific purpose for which the evidence was admitted. *State v. Haygood*, 308 Kan. 1387, 1392-93, 430 P.3d 11 (2018).

Under K.S.A. 2020 Supp. 60-455(a), (b), "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion," but "such evidence is admissible when relevant to prove some other material fact including motive,

opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Prior to trial, the State filed a motion to introduce evidence of prior crimes and civil wrongs under K.S.A. 2020 Supp. 60-455. Evans filed a written objection. The State specifically sought leave to introduce evidence of the following prior conduct:

- Evans calling and following Joel and staking out his house and workplace in the months leading up to the murder, in violation of no-trespass orders.
- Failure to comply with court orders granting Joel visitation with his daughter.
- Solicitation of others to kill Joel.
- Criminal threats to Joel and to his coworkers.

The State argued this evidence would be probative to matters of motive, nature of the relationship between Evans and Joel, intent, and identity. The district court heard witness testimony as well as arguments by counsel and ruled from the bench with respect to most of the evidence at issue, granting the State's motion and recognizing a continuing objection by Evans.

The solicitation evidence consisted of testimony by Evans' former friend Sidney about conversations she had with Evans. Evans presented various plans to Sidney including:  to go to Joel's mother's house on a Friday evening, meet her at the door, shoot and burn down the house. They would use Sidney's car instead of Evans', and Evans would provide the gun. Evans also told Sidney that she had asked two other people—Frank and Tyrel—to kill Joel.

The criminal threats evidence consisted of the testimony of Joel's coworkers. Joel had played voicemails that Evans left on his phone. On one voicemail, a couple of weeks before the shooting, Evans threatened to kill Joel, herself, and their daughter. In another voicemail, Evans said that, if she could not have Joel, she would shoot him so that no one else could have him. In another message, left after she was seen parked down the street watching Joel at work, she said she would shoot him and everyone at the work site.

The trial court explicitly found that the evidence had probative value that outweighed the prejudicial effect it could have, and that the evidence was admissible as tending to prove a discordant relationship, motive, plan, and identity.

The evidence was material because it demonstrated motive. In the absence of the background context of the parties' relationship, it would have been unclear to the jury why Evans could have behaved as charged. As this court stated in *Haygood*, 308 Kan. at 1395: "The evidence in this case would have been highly confusing without the explanation of why Haygood would feel the need to kill Mills when she called the police." Much the same can be said in the present case: it would have been highly confusing without an explanation of why Evans would try to end her relationship by murdering Joel. As we explained in *State v. Engelhardt*, 280 Kan. 113, 128, 119 P.3d 1148 (2005): "Motive supplies the jury with some degree of explanation, responding to a juror's natural tendency to wonder why a defendant behaved in the manner described by the State."

The State also introduced the evidence to bolster its case for premeditation. Plan evidence is admissible under either of two theories: first, that there is some direct connection between the earlier conduct and the crimes charged. In such a case, since the two events are causally connected, proving the defendant's involvement in the earlier incident logically tends to establish the defendant's involvement in the charged crime as

22

well. Under the second theory, the two events do not have to be directly or causally connected, but the method of committing the prior act must be so similar to the method used in the charged crime that it is reasonable to conclude that the same individual committed both acts. *State v. Torres*, 294 Kan. 135, 140-41, 273 P.3d 729 (2012).

It is under the first theory that the evidence was admitted in the present case. Evans' attempts to keep Joel from spending time with his daughter and her solicitation of others to kill Joel established a causal connection between her earlier conduct and the eventual shooting. The evidence demonstrated that Evans had been figuring out a detailed plan for killing Joel for many months and carried out that plan the night of the murder.

The evidence also strongly supported the identity of Evans as the shooter. She had not only threatened to shoot Joel and sought out the services of others to kill him, but she described to Sidney specific details that corresponded to the manner in which the crime would later be committed. This evidence was material to showing that it was not some random other person who got in Towell's car at Evans' house and showed up at the scene at the time of the crime.

Even if the evidence was material and probative, it would not be admissible if it was unduly prejudicial. "All evidence that is derogatory to the defendant is by its nature prejudicial to the defendant's claim of not guilty. Evidence that actually or probably brings about a wrong result under the circumstances of the case is 'unduly prejudicial.'" *State v. Clark*, 261 Kan. 460, 477, 931 P.2d 664 (1997).

The prior acts evidence in the present case was certainly highly prejudicial in that it provided damning proof of motive, premeditation, and identity. The question here is whether the evidence was unduly prejudicial. Addressing this question calls for the court to analyze several factors:

23

"In evaluating the probative value of evidence of other crimes or civil wrongs, the district court should consider, among other factors: how clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how seriously disputed the material fact is; and whether the government can obtain any less prejudicial evidence. In evaluating the possible prejudicial effect of evidence of other crimes or civil wrongs, the district court should consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct." *State v. Boysaw*, 309 Kan. 526, 541, 439 P.3d 909 (2019).

The question is not whether the jury would have convicted without the evidence at issue; the question is whether the evidence placed undue emphasis on the prior acts, leading the jury to convict of prior crimes that were not the ones charged. The danger is that the jury might conclude that, even if Evans was not guilty of the charged crimes, she should be convicted of being an unpleasant person or a person who does not respect the rights of others. See *State v. Bly*, 215 Kan. 168, 174, 523 P.2d 397 (1974) (prior acts evidence might lead jury to conclude defendant deserves punishment as a general wrongdoer even if prosecution fails to establish guilt beyond reasonable doubt). That was highly unlikely in the present case. The cumulative effect of the evidence was to demonstrate motive, preparation, and identity, not to show that Evans was guilty of stalking or avoiding her child custody obligations.

On appeal, Evans argues that motive, the relationship of the parties, and a continuing course of conduct were not disputed material facts, and the admission of evidence relating to those facts constituted an abuse of discretion because it overly focused the jury on issues not in dispute.

Evans calls attention to this court's warning against using prior conduct simply to prove the motive for committing "the current, virtually identical, bad act." See *State v. Wells*, 289 Kan. 1219, 1228, 221 P.3d 561 (2009). She contends that the evidence of threats and violating no-contact orders was not evidence of motive but instead served as "propensity" evidence. She also argues that motive was not a disputed material fact because she denied committing the act, so there would be "no dispute about why the act was committed."

These arguments are puzzling. The evidence showed that a jealous Evans was increasingly motivated by anger and a desire to disrupt Joel's life. The evidence of soliciting murder was tied into this, but more directly showed preparation and intent. And a defendant may not avoid motive evidence simply by contending he or she did not commit the act; often, motive is used for the precise reason of helping to prove he or she *did* commit the act.

Evans asserts that "the tumultuous nature of the relationship between Joel and Tria was never in dispute." This is equally puzzling. Without the testimony to which Evans objects, the tumultuous nature of the relationship would have been in dispute. There would have been little explaining the relationship of the parties, and Evans never stipulated to an obsessive, threatening relationship. The evidence of their relationship was essential to establish the context for the events of November 3.

Finally, Evans attacks Sidney's testimony about the corrosive relationship between Evans and Joel and about Evans' solicitation attempts. Evans questions the reliability of Sidney's testimony because the conversations took place eight or nine months before the shooting and because Sidney had a falling-out with Evans. These concerns go to the credibility of the evidence, which was a matter for the trial judge and the jury, not an appellate court, to evaluate. Even if considered on appeal, a review of the cross-

examination of Sidney does not suggest any unreliability, ill will, or incompleteness in Sidney's account of her relationship with Evans. There is no indication that the trial court abused its discretion in allowing that testimony to come in.

The prior acts in the present case ran together in a continuing course of conduct that culminated with the shooting and arson. Evans' anger at Joel, her desire to prevent him from bonding with their daughter, and her preparations to kill him did not all take place in a single hour or even day. If they had, there would be little question about "prior crimes or civil wrongs." But here, the planning and conduct went on over many months, which is what the State was trying to prove through the vehicle of prior crimes and civil wrongs evidence.

Nothing suggests the trial court abused its discretion in allowing prior acts evidence to come in for the purposes stated:  motive, intent, and identity. Those were legitimate issues for the jury to consider, and, without the context for the crimes, the jury would have been hobbled in its ability to reach a reasoned and fair verdict.

C.    *The Requested Presentencing Mental Health Evaluation*

Following the trial and conviction but before sentencing, Evans filed a request for a mental evaluation under K.S.A. 2020 Supp. 22-3429. At the sentencing hearing, the court considered the motion and made a perfunctory ruling:  "That request is denied. It is true that there has not really been an issue of mental illness in this case. The motion is denied."

A district court's decision whether to order an evaluation under K.S.A. 2020 Supp. 22-3429 is reviewable for abuse of discretion. See *State v. Maestas*, 298 Kan. 765, 790,

316 P.3d 724 (2014). On appeal, Evans contends the trial court's response to her request was an abuse of discretion requiring remand for resentencing.

Prior to ruling on Evans' request, the court asked defense counsel if she wanted to add anything to the written motion. She answered no. This means the only basis for granting the motion would have been contained in the written request, and that request stated no reason at all for granting it. But Evans contends the trial court was obligated to elucidate on its reason for denying the request.

Under Evans' reasoning, mental evaluations would be the rule, and not ordering them would be an exception subject to close appellate scrutiny. In practical effect, Evans asks this court to establish a rule that all requests for presentencing mental evaluations must be granted unless the trial court can state some compelling reason not to grant the request. We decline to impose such a burden on sentencing courts. No such rule is contained in the statutory language, and such a rule would be contrary to the plain language of the statute, which says that "the trial judge *may* order the defendant committed for mental examination, evaluation and report." (Emphasis added.)K.S.A. 2020 Supp. 22-3429.

The statutory evaluation scheme is clearly permissive, and it is the defendant's burden to persuade a sentencing court that a mental examination serves the interests of justice. When a party presents no facts and makes no argument to support its request for relief, an issue may be deemed abandoned. Furthermore, while the district court did not make any factual findings beyond stating that mental illness had never been an issue in the case, surely Evans had some burden to establish a record of her argument and the findings that led to its rejection. See, e.g., *State v. Estrada-Vital*, 302 Kan. 549, 559, 356 P.3d 1058 (2015).

Simply asserting that the trial court denied a request does not elevate an issue to the status of preserved for appeal. "To be valid, a motion must include a request or demand for the relief sought, or for the order the party desires the trial court to enter*; a motion generally must specify the grounds and relief sought with particularity*." (Emphasis added.) 56 Am. Jur. 2d Motions, Rules, and Orders § 9. See, e.g., *State v. Everett*, 62 Kan. 275, 276-77, 62 P. 657 (1900) (no error in overruling motion when movant asserted no grounds for motion).

Here, Evans never stated any grounds to the trial court why it should grant her request for a mental health evaluation. She created no record in support of her motion, and she essentially abandoned the argument below. For these reasons, this issue fails to present reversible error.

CONCLUSION

The case against Evans was conclusive. The trial court did not admit improper hearsay evidence, and the evidence of prior misconduct on her part was important to establish her identity as the killer, the context for her actions, and her state of mind in premeditating the murder. The trial court did not abuse its discretion in denying her request for a mental health evaluation.

The convictions and sentence are affirmed.