NOT DESIGNATED FOR PUBLICATION

No. 122,922

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BRETT T. SEACAT,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Kingman District Court; EDWARD E. BOUKER, judge. Opinion filed February 11, 2022. Affirmed.

*Clayton J. Perkins* and *Meryl Carver-Allmond*, of Capital Appellate Defender Office, for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., POWELL and ISHERWOOD, JJ.

PER CURIAM: Brett T. Seacat appeals the district court's summary denial of his K.S.A. 60-1507 motion, his supplemental K.S.A. 60-1507 motion, and his amendment to his K.S.A. 60-1507 motion. Seacat argues the district court erred when it refused to consider the claims in the supplemental motion and the amendment because they related back to the original motion and were therefore timely. Seacat also argues that even if the supplement was not timely, the State conceded it was timely and, therefore, waived the right to challenge the timeliness. And finally, Seacat argues that the district court erred in

1

summarily denying his claims without an evidentiary hearing. For the reasons stated below, we reject Seacat's claims and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Our Supreme Court recited the facts of Seacat's case in *State v. Seacat*, 303 Kan. 622, 622-27, 366 P.3d 208 (2016), when the court affirmed his convictions:

"In April 2011, Seacat lived with his wife, Vashti, and their two sons in their house in Kingman, Kansas. Seacat was employed at the time as a police instructor at the Kansas Law Enforcement Training Center. He had previously worked for the Sedgwick County Sheriff's Department. In the early morning of April 30, police and fire personnel responded to a call to the Seacat residence, where they found the house on fire and found Vashti lying dead on her bed, the victim of a gunshot wound to her head. The circumstances of the fire and her death would become the focus of Seacat's criminal trial.

"For several years, his marriage with Vashti had shown signs of troubles. In November 2010, Seacat and Vashti began seeing Connie Suderman, a clinical social worker, for marital counseling. Suderman met with Seacat and Vashti together, and with Vashti individually, through the end of April 2011. She also met several times individually with Seacat. As the counseling continued, Vashti and Seacat considered the possibility of divorce.

"According to Suderman, Vashti's mood was sad and symptomatic of depression when the counseling began. Those symptoms improved 'dramatically,' and by April 2011, Vashti was saying that she felt better than she had in years. Vashti's outlook became hopeful, and she was making healthy life changes, such as exercising and eating better, as well as planning to move closer to her sister and to her place of employment. Vashti spoke often about her sons, about how she loved them and how she loved being a mother.

"In response to a direct question from Suderman, Vashti said she would never commit suicide because of her religious faith and because of her love for her sons. She also relayed to Suderman that Seacat was not handling the prospect of divorce well and had threatened to kill her if she left him. In individual counseling, Seacat told Suderman that, if Vashti divorced him, he would make sure that she never saw her children again, even if it meant taking them out of the country.

2

"On April 19, Vashti had her last individual session with Suderman. Vashti reported that Seacat had awakened her one night and told her that he had a dream in which he killed her. She was worried about how he would react to her filing for divorce, and she wanted to have someone with her and the children when he was served with process. Suderman and Vashti arranged for a safety plan for Vashti's protection when she served Seacat with divorce papers.

"Seacat knew that Vashti wrote a personal journal, which she kept on a table beside the bed. About a month before her death, Seacat took the journal to the Center and scanned and subsequently printed numerous pages. He testified that he did this at Vashti's request, because she wanted an electronic copy of the journal as a keepsake.

"On the morning of April 29, Seacat drove to his office and opened an envelope containing the divorce papers that Vashti had given him. That afternoon, while still at work at the Law Enforcement Training Center, he located an overhead projector in storage and used it for about an hour. Seacat then inquired of maintenance staff the best way to dispose of computer hard drives, and on their recommendation he used a torch to destroy the drives and threw the melted hard drives in a trash can. He next decided to throw three old cell phones in the trash because they had not been used for a long time, believing they had little or no resale value. Later that afternoon, he drove to a convenience store and purchased gasoline, which he testified he put into his pickup truck.

"Early in the morning of April 30, 2011, police responded to a report of a fire and possible shooting at the Seacat residence. The second story of the house was in flames, and Seacat was standing in the backyard by the driveway. The police officer asked Seacat whether anyone was inside the house, and Seacat responded that his wife was there. The officer inquired further, and Seacat said, 'She's dead. She shot herself. Her fucking head is gone.'

"After the fire department arrived and extinguished the fire, Vashti's body was found lying on a bed in an upstairs bedroom. An investigator found a Ruger Redhawk 44-caliber revolver lying on the bed under Vashti's body, with the barrel pointed down toward her legs. A single gunshot wound through her head and into her neck proved to be the cause of her death. A 5-gallon gasoline container was lying on the middle of the bed.

"A neighbor who had been unable to sleep was awake and watching a television program that morning. She heard a sound which she described as sounding like a gunshot, based on other gunshots she had heard in the past. Frightened, she covered her head until she saw the lights of emergency vehicles arriving. Based on the timing of what

was taking place on the show she was watching when she heard the gunshot, investigators concluded that she heard the shot at 3:15 a.m.

"An investigating special agent later determined from the burn patterns and different kinds of damage that the fire started in the hallway and moved south to north into the bedroom. Searching through the house, investigators found on the dining room table a water-soaked printed PowerPoint presentation that included information about suicide wounds and death investigations, specifically, death investigations involving fires. One of the pages discussed investigations distinguishing between homicides and suicides, and one page discussed reasons for suicides, including severe marital strife, recent emotionally damaging experiences, financial difficulties, humiliation, and revenge.

"The coroner's report and testimony indicated that Vashti nearly instantaneously died from a bullet wound to her head. She had also sustained gunshot wounds to her torso, hip, and thigh. These wounds were consistent with shots 'cooking off' the gun from the heat of the fire. Blood tests and lung tests were negative for smoke inhalation. Blood and urine tests were also negative for alcohol and a wide variety of drugs. The coroner reached no conclusion as to whether the death was murder or suicide.

"On May 13, 2011, the State filed a complaint/information charging Seacat with one count of premeditated first-degree murder, one count of aggravated arson, and two counts of aggravated endangering a child based on the presence of the couple's two sons in the house at the time of the fire.

"The State's theory at trial was that Vashti was in good spirits and was looking forward to a new life after her marriage. Seacat was unwilling to accept divorce as the way his marriage would end. He threatened Vashti that he would murder her, burn the house down, and convince investigators that it was a suicide based on his expertise in law enforcement. He used an overhead projector to project her handwriting from her journal and trace the letters to compose a suicide note. When it appeared to him that she was going to go through with the divorce, he shot her in her sleep, doused the hallway and bedroom with gasoline, placed a call from her phone to his phone, and then lit the fire.

"Seacat's theory was that, while Vashti was outwardly in good spirits, she was privately uncertain and depressed about her faltering marriage. She took Seacat's threats seriously that he would take the children and she would never see them again. She made up stories about him threatening to kill her so that she would have an improved posture with friends and courts in the event of a contested divorce. Seacat borrowed her journal to do her the favor of scanning it, and he borrowed the overhead projector to learn more

about forgeries for his work at the police academy. Having filed for divorce, Vashti became overwhelmed with regret, sought to burn the house down with her children it, and shot herself.

"Vashti's journal was pivotal to the case. If Vashti had written about planning to commit imminent suicide, it would strongly bolster Seacat's theory. If, on the other hand, the expression of suicidal ideation was forged, it would seriously undermine his theory and bolster the State's case.

"Two days after the death and fire, investigators found Vashti's journal in her car. On the last page was a hand-written message reading:

'Brett—I can't do this. I can't fight this out. Take care of our boys. Be sweet to Brendon. Talk to Bronson. Hold them both and tell them "Mommy loves them" every night. I'm taking care of the house.

'Brendon—you are so wonderful. Mommy is so proud of you. Be a good big brother.

'Bronson—stay strong and don't ever lose that smile.

'I love the two of you and will be watching over you from Heaven.'

"Dennis McPhail, a certified forensic document examiner for the Kansas Bureau of Investigation, testified for the State. He testified that there were certain incongruities in the last journal page that led him to conclude that the writing had been traced from other samples of Vashti's handwriting. These discrepancies included tremorous writing and smearing, which contrasted sharply with the fluid writing that was highly consistent in Vashti's known writing samples. He pointed to features indicating that the writing had been done slowly, with added corrections to certain letters. He noted that Vashti's lower case 'd' was very consistent throughout many samples of her handwriting, but it was formed using a different stroke in the last journal page. These and other specific disparities led him to conclude that the suicide note was probably traced and was a 'spurious document.'

"Avis Odenbaugh, a forensic document examiner called on Seacat's behalf, testified that the journal page was the product of natural writing and that the journal page in question was written by the same person who wrote the other entries in the journal. She ruled out a tracing of the text based on apparent ink flow. Odenbaugh testified that differences in the handwriting between the journal page and other samples of Vashti's handwriting could be explained because of mood or tension. On cross-examination, she acknowledged that the first part of the journal page appeared unnatural and that there

5

were tremors apparent in writing some of the letters, but she explained that those could be due to medication or state of mind.

"Also important to resolving the opposing theories of the event were out-of-court statements attributed to Vashti. Some of these statements indicated that Seacat had threatened to kill her and make the murder look like a suicide. Other statements were introduced by Seacat and would suggest that Vashti was depressed and suicidal on the evening of the fire.

"After a 12-day trial, the jury found Seacat guilty on all four counts, and the district court sentenced him to a life sentence without the possibility of parole for 25 years for the murder conviction, a consecutive sentence of 61 months for the aggravated arson conviction, and consecutive sentences of 7 months for each of the child endangerment convictions." 303 Kan. at 622-27.

Our Supreme Court affirmed Seacat's convictions. 303 Kan. at 646. The court issued its mandate on February 12, 2016.

On January 9, 2017, Seacat timely filed a pro se motion for postconviction relief under K.S.A. 60-1507, alleging 32 grounds for relief. Seacat completed his motion on the standard Judicial Council form. Paragraphs 10 and 11 of the form required Seacat to "state concisely all the grounds" he alleged and "the facts which support each of the grounds . . . and the names and addresses of the witnesses or other evidence upon which you intend to rely." In response to these paragraphs, Seacat attached 13 pages of detail complaining about improper police investigation and various evidentiary issues at trial. Paragraph 20 of the form required Seacat to "state concisely and in detail what counsel failed to do in representing [his] interests." Seacat answered this paragraph by stating:

"In all of the following listed references, Defense Attorney Roger Falk failed to 1. adequately address in court what is stated in the references, 2. point out to the jury what is stated in the references & 3. take action to correct illegal procedures done to incriminate Seacat or point out those actions to the jury as stated in the references. Reference 10.(a) through 10.(gg) and 11.(a) through 11.(gg)."

6

On April 14, 2017, with the assistance of counsel, Seacat filed a supplement to his K.S.A. 60-1507 motion raising three new claims—all ineffective assistance of counsel. More specifically, Seacat alleged that Falk was ineffective for failing to move to recuse the trial judge, failing to move for a change of venue, and in hiring Odenbaugh as a handwriting expert. Then, on July 17, 2018, Seacat filed an amended K.S.A. 60-1507 motion. The amendment added no new claims but tried to clarify that all the claims in the original motion were ineffective assistance of counsel claims and provided additional support for those claims. The amendment abandoned four original claims, conceding they were addressed in the direct appeal, leaving Seacat with 31 claims presented to the district court.

The district court held a preliminary hearing on January 8, 2020. The first matter argued was the timeliness of the supplement. Seacat's attorney admitted that the three supplemental claims were "new and distinct and separate from" Seacat's original motion. But he argued that Seacat's direct appeal was not final until his time to petition the United States Supreme Court for certiorari had expired. Thus, he argued, Seacat had 90 more days after the mandate to bring new claims. The State's attorney had no objection, responding, "I believe [Seacat's attorney] is correct. I'm not going to argue that."

Next, Seacat's attorney argued that the amendment was timely because it related back to the original motion. Seacat's attorney argued that because Seacat "did allege ineffective assistance of counsel" in his original motion, even if it was not in "great detail," that the court should liberally construe the motion and find that it was sufficient.

Finally, Seacat's attorney argued that if the court found the supplement and amendment untimely, the time limitation should be extended to prevent manifest injustice. He argued that the timeliness was impacted by the size of the record and it would be a manifest injustice not to consider the new claims for this reason.

The State responded that many of Seacat's claims should have been raised in his direct appeal because they were trial error claims. The State argued that the ineffective assistance claims in the amendment were "untimely because they're not related back to the original claims raised by Mr. Seacat." The State argued that if the court found the claims timely, the original motion was insufficient because it was "generally very speculative," and Seacat did not "identify true evidentiary basis for the claims." The State argued that Seacat's response to paragraph 20 was not specific enough to sufficiently claim ineffective assistance of counsel and so any amended claims could not relate back.

On April 21, 2020, the district court filed a 34-page memorandum decision denying Seacat any relief on his K.S.A. 60-1507 motion and related pleadings. The district court first addressed what it considered 23 trial error claims in Seacat's original motion, finding that Seacat had offered no exceptional circumstances excusing his failure to raise these matters in his direct appeal. The district court also found that Seacat failed to provide witnesses or evidence to support his claims and that the claims were little more than conjecture and conclusory statements. Thus, the district court found that an evidentiary hearing was not warranted on these claims because the files and records conclusively showed Seacat was not entitled to any relief.

The district court next evaluated the timeliness of the supplement and the amendment. Relying on K.S.A. 60-1507(f)(1), the district court noted that Seacat had one year from the issuance of the Kansas Supreme Court's mandate to file his K.S.A. 60-1507 motion. The mandate was issued on February 12, 2016, and he filed his original motion within the year on January 9, 2017. Seacat then filed his supplement on April 14, 2017, and his amendment on July 17, 2018—both outside the one-year window.

Relying on *Pabst v. State*, 287 Kan. 1, 192 P.3d 630 (2008), the district court analyzed whether the claims in the supplement and amendment were based on facts of the same "time and type" as those supporting the claims in the motion. But first the district

8

court considered whether the ineffective assistance of counsel claims in Seacat's original motion were raised with sufficient specificity to be addressed by the court.

The district court found that if Seacat's responses to paragraphs 10, 11, and 20 of the original motion were taken together and construed liberally, then there was a vague, general implication of ineffective assistance of counsel. But the district court also found that the "responses under paragraph 20 are so broad and unfocused that they leave the court, when considering them with paragraphs 10 and 11, with no idea what specific complaints Seacat has about counsel." Ultimately, the district court found that Seacat's original motion raised five ineffective assistance of counsel claims against Falk with sufficient specificity to be addressed by the court.

Returning to the timeliness issue, the district court found that because the supplement raised all new issues with no reference to the original motion, it did not rely on facts of the same time and type and so it was untimely, and the district court dismissed it. As to the amendment, the district court found that the ineffective assistance of counsel claims that related back to the five specific claims in the original motion could be addressed by the court. Finally, the district court dismissed any amended claim alleging ineffective assistance of counsel by J. Val Wachtel because the original motion only mentioned Falk, so these claims did not relate back and were untimely.

After dismissing the supplement and parts of the amendment as untimely, the district court addressed the five ineffective assistance of counsel claims that related back to the original motion. The district court found that Seacat did not satisfy his burden of showing that Falk was deficient or that Seacat was prejudiced. More specifically, the district court found that "Seacat's assertions and conclusions stand unsupported in his pleadings or in the files and records of this court" and that "Seacat wholly fails to establish an evidentiary basis for his contentions." The district court denied the entire motion and dismissed all claims. Seacat timely appealed the district court's judgment.

On appeal, Seacat first claims the district court erred in refusing to hear parts of the supplement and amendment because they related back to the timely motion. Second, Seacat claims the supplement was timely filed and, even if not, the State conceded it was timely filed and thus waived the issue. Third, Seacat claims his pleadings raised many instances where counsel was ineffective in failing to investigate and present exculpatory evidence, and he should have received an evidentiary hearing on those claims.

We will address Seacat's claims in a different order than he has presented. We also observe that although Seacat argued at the preliminary hearing in district court that the time limitation for filing the supplement and amendment should be extended to prevent manifest injustice, he has not made this argument on appeal. An issue not briefed is deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018).

DID THE DISTRICT COURT ERR BY FINDING SEACAT'S SUPPLEMENT UNTIMELY?

Seacat claims the district court erred by finding the supplement was untimely filed. First, he argues that the supplement was timely filed because it was filed within one year of the deadline for him to petition for certiorari with the United States Supreme Court in his direct appeal. Second, he argues that the State conceded at the preliminary hearing that the supplement was timely filed and thus waived the issue. The State argues that Seacat filed his supplement after the one-year time limitation, and it is thus untimely. The State also denies affirmatively waiving a statute of limitation defense.

When the district court summarily dismisses a K.S.A. 60-1507 motion, an appellate court conducts a de novo review to determine whether the motion, files, and records of the case conclusively establish that the movant is not entitled to relief. *Beauclair v. State*, 308 Kan. 284, 293, 419 P.3d 1180 (2018). And whether a motion is timely under K.S.A. 60-1507 involves statutory interpretation which is a question of law

10

over which this court has unlimited review. *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 472, 15 P.3d 338 (2000).

*Was Seacat's Supplement Timely Filed?*

Seacat argues that the supplement was timely filed because he had one year from the termination of appellate jurisdiction to file his motion. He argues that final appellate jurisdiction terminated when the time for petitioning the United States Supreme Court for certiorari elapsed even though he did not file such a petition.

K.S.A. 2020 Supp. 60-1507(f) states in part:

> "(1) Any action under this section must be brought within one year of:
> (A) The final order of the last appellate court in this state to exercise jurisdiction on a direct appeal or the termination of appellate jurisdiction; or
> (B) the denial of a petition for a writ of certiorari to the United States supreme court or issuance of such court's final order following granting such petition."

The Kansas Supreme Court filed its opinion in Seacat's direct appeal on January 15, 2016. *Seacat*, 303 Kan. 622. The Supreme Court issued the mandate on February 12, 2016. Although Seacat did not petition for a writ of certiorari, he had 90 days from the date of the opinion to do so, or until April 14, 2016. See 28 U.S.C. § 2101; United States Supreme Court Rule 13 (stating the time to petition for a writ of certiorari is 90 days from the entry of judgment or order sought to be reviewed and not from the issuance of the mandate).

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State v. LaPointe*, 309 Kan. 299, 314, 434 P.3d 850 (2019). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary

meanings. See *State v. Ayers*, 309 Kan. 162, 163-64, 432 P.3d 663 (2019). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind the clear language, and it should refrain from reading something into the statute that is not readily found in its words. 309 Kan. at 164.

Seacat argues that under K.S.A. 2020 Supp. 60-1507(f)(1)(A), he had one year from the termination of appellate jurisdiction to seek relief and that "a direct appeal is not final until the 90 days to file a petition for certiorari has passed." Seacat first cites *Guadina v. State*, 278 Kan. 103, 106, 92 P.3d 574 (2004), to support his proposition. In *Guadina*, our Supreme Court held that a criminal case is not final until the time for filing a petition for a writ of certiorari with the United States Supreme Court has elapsed. 278 Kan. at 106. But *Guadina* is distinguishable because the issue in that case was the finality of a conviction for the purpose of retroactively applying new law. The case does not address the deadline for filing postconviction relief.

More on point is Seacat's next authority, *Clay v. United States*, 537 U.S. 522, 524-25, 123 S. Ct. 1072, 155 L. Ed. 2d 88 (2003). In *Clay*, the petitioner filed a motion for postconviction relief under 28 U.S.C. § 2255—the federal statute for federal habeas corpus—exactly one year from the time his window closed for petitioning the United States Supreme Court for certiorari. This was 1 year and 69 days after the Seventh Circuit Court of Appeals issued its mandate in the case. The relevant corresponding subsection of § 2255 states that the one-year time limitation for federal habeas motions runs from "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). The United States Supreme Court considered what it meant for the conviction to become final in *Clay*. The Court rejected the "issuance of the appellate court mandate as the triggering date" and instead held that "a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction." 537 U.S. at 524-25. But *Clay* is distinguishable from Seacat's case because the federal habeas statute is not worded the same as the corresponding Kansas statute.

12

K.S.A. 2020 Supp. 60-1507(f)(1) provides that the one-year filing window closes after "the final order of the last appellate court in this state to exercise jurisdiction on a direct appeal or the termination of such appellate jurisdiction" or "the denial of a petition for writ of certiorari to the United States Supreme Court or issuance of such court's final order following granting such petition." We agree with the district court that the supplement was untimely filed under these provisions.

Under K.S.A. 2020 Supp. 60-1507(f)(1)(A), the final order of the last appellate court in this state to exercise jurisdiction on a direct appeal was our Supreme Court's mandate issued on February 12, 2016. The mandate also marked the termination of our Supreme Court's jurisdiction over Seacat's direct appeal. After our Supreme Court filed its decision in Seacat's direct appeal, he could have filed a notice of intent to file a petition for a writ of certiorari to the United States Supreme Court, which would have automatically stayed the issuance of the mandate. See K.S.A. 2020 Supp. 22-3605(b). But Seacat did not take this action and our Supreme Court filed its mandate.

Under K.S.A. 2020 Supp. 60-1507(f)(1)(B), the deadline for filing for relief is one year from the *denial* of a petition for a writ of certiorari to the United States Supreme Court or the issuance of such court's final order following the granting of such petition. Had Seacat timely petitioned for a writ of certiorari, his deadline for filing for postconviction relief under subsection (f)(1)(B) would have been extended to at least one year from the denial of the petition. But Seacat never petitioned for a writ of certiorari, so subsection (f)(1)(B) does not apply to him.

In sum, under a plain reading of K.S.A. 2020 Supp. 60-1507(f)(1), Seacat needed to file his supplement by February 12, 2017. He did not. Seacat filed his supplement on April 14, 2017, and it was thus filed untimely.

*Did the State waive K.S.A. 60-1507(f)?*

Seacat also argues that the State conceded at the preliminary hearing that the supplement was timely filed and thus waived the issue. At the preliminary hearing, Seacat's attorney argued that the supplement was timely filed because the deadline for filing it was one year from his deadline to file a writ of certiorari to the United States Supreme Court in his direct appeal. The State's attorney did not object to Seacat's argument, responding, "I believe [Seacat's attorney] is correct. I'm not going to argue that." When the State later filed a written response to the supplement, the State did not address the timeliness of the supplement and only addressed the merits of the claims.

On appeal, the State denies affirmatively waiving a statute of limitations defense. The State asserts that its counsel was put on the spot at the preliminary hearing and emphasizes that he stated, "I *believe* [Seacat's attorney] is correct," and he also stated, "*If* in our response we used the wrong date, I'll acknowledge [that]." (Emphases added.) The district court did not address the potential waiver issue in its memorandum decision.

We will not split hairs over the comments made by the State's attorney at the preliminary hearing. Our reading of the record reflects that, at the preliminary hearing, the State indicated that it was not asserting the untimeliness of the supplement as a defense. Nor did the State raise the untimeliness of the supplement in its written response.

Seacat is correct that panels of this court have compared K.S.A. 60-1507(f) to a statute of limitations. See *Baker v. State*, 57 Kan. App. 2d 561, 569, 457 P.3d 183 (2019); *Morningstar v. State*, No. 116,857, 2018 WL 297336, at *2 (Kan. App. 2018) (unpublished opinion) (calling K.S.A. 2017 Supp. 60-1507[f] a statute of limitations); *Bradford v. State*, No. 117,354, 2017 WL 6062089, at *1 (Kan. App. 2017) (unpublished opinion) (calling K.S.A. 2016 Supp. 60-1507[f] a statute of limitations).

But some panels have held that the one-year deadline under K.S.A. 60-1507(f) is a statutory bar that cannot be waived, and the burden is on the movant to show manifest injustice to extend the deadline. See *Burden v. State*, No. 114,738, 2016 WL 7324420, at *5 (Kan. App. 2016) (unpublished opinion) (explaining the time limitation to file a K.S.A. 60-1507 motion is not an affirmative defense, but it is a statutory ground on which the district court can deny a motion and the State need not file a response); *Saleem v. State*, No. 94,945, 2006 WL 3353769, at *7 (Kan. App. 2006) (unpublished opinion) (recognizing that K.S.A. 60-1507[f] is "an absolute bar to a 60-1507 motion" absent a showing of manifest injustice).

In *Burden*, the district court summarily dismissed Burden's K.S.A. 60-1507 motion as untimely and successive without holding an evidentiary hearing. Burden argued the State waived its claims that the motion was both untimely and successive because it did not raise the claims in a response to his motion. This court reasoned that "[d]espite Burden's attempt to analogize successiveness and timeliness to traditional affirmative defenses that a party must raise in a responsive pleading or risk waiving, neither successiveness nor timeliness in a K.S.A. 60-1507 motion is an affirmative defense." 2016 WL 7324420, at *5. The court then stated:

> "[60-1507 time limitations] are statutory grounds upon which a district court can summarily deny a habeas motion based on review of the motion and the case file. And since the district court can summarily deny a K.S.A. 60-1507 motion based only on the motion and the case file (without a response from the State), it necessarily follows that the State is not required to file a response to a K.S.A. 60-1507 motion. Under the statute, the State isn't required to file a response to a K.S.A. 60-1507 motion; accordingly it cannot 'waive' any 'affirmative defenses' by not filing a response. [Citations omitted.]" 2016 WL 7324420, at *5.

We find the panel's reasoning in *Burden* to be persuasive. The one-year deadline in K.S.A. 2020 Supp. 60-1507(f)(1) is a statutory bar against seeking relief that can be

15

extended only by a showing of manifest injustice. K.S.A. 2020 Supp. 60-1507(f)(2) and (3). The burden is on the movant to show manifest injustice. *State v. Kelly*, 291 Kan. 868, 873, 248 P.3d 1282 (2011). Thus, if there is any burden under the statute, it is on the movant to extend the deadline, not on the State to assert it. And the State is not required to file an answer to a K.S.A. 60-1507 motion. Thus, the State does not waive the one-year deadline by failing to assert it as an affirmative defense in an answer the State is not required to file.

We conclude the one-year deadline under K.S.A. 2020 Supp. 60-1507(f) is not a statute of limitation. It is a statutory bar with one exception for manifest injustice; and that exception places the burden on the movant to show the court why the untimely filing should be considered. Thus, the State could not waive the deadline and the district court properly applied the statute in finding the supplement was untimely.

### DID THE DISTRICT COURT ERR IN FINDING THAT ONLY FIVE OF SEACAT'S AMENDED CLAIMS RELATED BACK TO THE ORIGINAL MOTION?

Next, Seacat claims the district court erred in finding that none of the claims in his supplement and only five of his claims in the amendment related back to the original motion and were thus timely. To recap, the district court found that all but five of the ineffective assistance of counsel claims in the original motion were insufficiently raised. Because most of the ineffective assistance of counsel claims were insufficiently raised in the original motion, the district court reasoned there was nothing for the claims in the amendment to relate back to and thus most of those claims were untimely. The district court also found that the supplement alleged different types of ineffective assistance of counsel claims than those raised in the original motion and thus could not relate back. Finally, the district court found that because Seacat only named his lead trial counsel in the original motion, any claims against his second counsel made in the later pleadings could not relate back. Seacat claims the district court was incorrect on all counts.

16

Seacat argues his original motion was sufficient to raise ineffective assistance of counsel claims under Supreme Court Rule 183(e) (2022 Kan. S. Ct. R. at 242), and the district court erred in ruling otherwise. Seacat also argues that his claims in the supplement and amendment were based on facts of the same time and type as the claims in the original motion. But even if not, Seacat argues that our Kansas "time and type" caselaw is contrary to the plain language of K.S.A. 60-215(c)(2). Finally, Seacat argues that any reference in his original motion to his lead trial attorney must be read to fairly include his entire trial team.

The State argues Seacat's amended claims do not relate back because "the trial errors raised in Seacat's initial motion differ in both time and type from the claims of ineffective assistance of counsel he raised in his amended motion." And while the State does not respond to Seacat's relation back argument for the supplement, it generally addresses the relation back theory in its response to Seacat's amendment arguments.

As stated earlier, appellate courts exercise unlimited review of the district court's summary dismissal of a K.S.A. 60-1507 motion. *Beauclair*, 308 Kan. at 293. Similarly, statutory interpretation presents a question of law over which appellate courts have unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019).

*Did the amended claims relate back to the original motion?*

Seacat concedes his amendment was filed out of time. But he argues that it should be considered timely because the amended claims relate back to the claims in the original motion. Seacat correctly notes that for his amendment to relate back, it needs a sufficient motion to relate back to. Supreme Court Rule 183(e) (2022 Kan. S. Ct. R. at 243) states that a K.S.A. 60-1507 motion "is sufficient if it is in substantial compliance with the judicial council form." The Kansas Supreme Court has stated that substantial compliance is something less than strict compliance and requires compliance "'to the essential matters

17

necessary to assure every reasonable objective.'" *Nguyen v. State*, 309 Kan. 96, 104, 431 P.3d 862 (2018) (quoting *Myers v. Board of Jackson County Comm'rs*, 280 Kan. 869, 874, 127 P.3d 319 [2006]).

Seacat cites *Nguyen* to argue that he substantially complied with Supreme Court Rule 183(e) and that the ineffective assistance of counsel claims in his original motion were sufficiently raised. In that case, a panel of this court found that Nguyen did not substantially comply with paragraphs 10 and 11 of the Judicial Council form for two reasons. The first reason was because paragraph 10 of the form asks the movant to "concisely" state all the grounds alleged and Nguyen included a 42-page memorandum, exhibits, and 10 pages of affidavits in support of the memorandum. Second, in paragraph 11, Nguyen did not organize his evidentiary support by each claim in paragraph 10. Instead, he listed 22 people and other documents of support that were mentioned "'sporadically'" throughout Nguyen's 52 pages of supporting documents. 309 Kan. at 103. "'It [was] unclear'" to the panel "'what evidence would be provided by the sources listed or what sources and evidence supported each claim of unlawful custody.'" 309 Kan. at 103.

The Kansas Supreme Court decided this court's reasoning did not hold up and observed that the form's instructions allowed for the use of additional pages:

"Reading the rule and the form instructions together would suggest that the reasonable objectives of Supreme Court Rule 183(e) are to provide the reviewing court with the information called for by the form's questions and to have that information presented in such a manner that the reviewing court can match the answers to their corresponding questions. Nothing prohibits the information from being presented in an attachment, and nothing prohibits an answer from incorporating an attached document by reference. Indeed, the instructions on the form specifically contemplate that additional pages may be necessary." 309 Kan. at 105.

18

The court found Nguyen had provided the necessary information, even if not in perfect conformity with the instructions. The court determined that "this case should not be about thwarting the fundamental purpose of affording K.S.A. 60-1507 relief by looking for a hypertechnical, strict compliance pleading requirement." 309 Kan. at 106.

In *Nguyen*, the Court of Appeals panel was seemingly frustrated by having to sort through Nguyen's voluminous material to try to learn his precise claims. But the problems with Seacat's original motion are more substantive than his merely submitting an unorganized pleading. Seacat's original motion raised 32 grounds for relief. Most of the grounds alleged mere trial errors with complaints about improper police investigation and various evidentiary issues at trial. Then in paragraph 20 that required Seacat to "state concisely and in detail what counsel failed to do in representing [his] interests," Seacat essentially asserted that Falk was ineffective in failing to address the claimed trial errors.

But when Seacat had a specific complaint about counsel, he stated it. Seacat criticized Falk's performance in five of his original 32 claims. Paragraph 10(d) of the original motion alleged that "Seacat begged Roger Falk to subpoena Cox [Comminications]" but he did not; paragraph 10(l) alleged that Falk "never subpoenaed, let alone, presented in court" evidence of a life insurance policy; paragraph 10(s) alleged that Falk possessed a video of a gun "placed in an oven & heated to 'cook off'," but Falk never showed it or called an expert to testify about his wife's body position; paragraph 10(cc) alleged that "Falk said he would relate in court" evidence about his wife's alleged pregnancy but did not; and paragraph 10(dd) alleged that Falk "never subpoenaed" his wife's supervisors to testify about her alleged pending layoff. Buried in Seacat's 13 pages of detail complaining about improper police investigation and various evidentiary issues at trial, Seacat made five specific claims about Falk's legal assistance. The district court agreed that, liberally construed, these claims alleged ineffective assistance of counsel and were not time-barred.

19

Unlike those five claims, Seacat never mentioned ineffective assistance of counsel, or counsel at all, in the 23 claims about police investigation and trial error. These claims complained mostly of planted, false, missing, misleading, or insufficient evidence and alleged misconduct of various State actors, including, investigators, Kansas Bureau of Investigation (KBI) agents, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) agents, the Fire Marshall, and the prosecutor. Even if this court construed Seacat's motion liberally, looking at the motion's content, there is no indication that Seacat was alleging ineffective assistance of counsel in these other claims.

Because the 23 trial error claims in Seacat's motion did not sufficiently raise an ineffective assistance of counsel claim, the district court did not error in dismissing the corresponding amended claims as untimely because the amended claims did not relate back to the motion. The district court properly considered five of the amended claims to be timely because, construed liberally, they were based on facts of the same time and type as those raised in Seacat's original motion.

*Did the three claims in the supplement relate back to the original motion?*

Seacat's supplement asserted three new claims of ineffective assistance of counsel. Seacat alleged that Falk was ineffective for failing to move to recuse the trial judge, failing to move for a change of venue, and in hiring Odenbaugh as a handwriting expert. Interestingly, at the preliminary hearing, Seacat's attorney admitted that the three supplemental claims were "new and distinct and separate from" Seacat's original motion, but counsel argued that the claims should be addressed because the supplement was timely filed. In its memorandum decision, the district court found that the supplemental claims depended on facts that were not the same time and type in the original motion, so the claims did not relate back and were dismissed as untimely.

20

"An amendment to a motion for relief under K.S.A. 60-1507 that asserts a new ground for relief which is supported by facts that differ in both time and type from those grounds set forth in the original motion does not relate back to the date of the original motion so as to circumvent the 1-year limitation of K.S.A. 60-1507(f)(1)." *Pabst*, 287 Kan. 1, Syl. ¶ 7.

We agree with the district court that Seacat's supplemental claims were supported by facts that differed in both time and type from the ineffective assistance of counsel claims raised in the original motion. In Seacat's original motion, he does not mention the judge's impartiality or venue at all. He does discuss his wife's handwriting in his original motion, but he makes no claim that Falk was ineffective in hiring a handwriting expert. Even construed liberally, it cannot be said that these new claims related back to any of Seacat's original claims, and the district court did not err in dismissing them.

Seacat makes a lengthy argument that our Kansas "time and type" caselaw is contrary to the plain language of K.S.A. 60-215(c)(2). But even if Seacat's argument has merit, we summarily reject it because this court is duty-bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We have no indication our Supreme Court is departing from its holding in *Pabst*.

*Should reference to Falk be extended to mean any member of the trial team?*

Finally, Seacat asks this court to liberally construe his pleadings to extend any reference to Falk or his lead attorney to include Wachtel, another attorney on the trial team. The district court dismissed any amended claims alleging ineffective assistance of counsel against Wachtel as untimely because Seacat never mentioned Wachtel in the original motion and so the court reasoned that the amendment did not relate back.

21

We see this claim as a nonissue. Seacat's five ineffective assistance of counsel claims that were sufficiently raised seem to focus on Falk. But it is Seacat's claims that matter, not the attorney involved in the claims. If any of Seacat's ineffective assistance claims have merit, then Seacat is entitled to relief whether the ineffective representation was provided by Falk or Wachtel. But the district court found that the motion, files, and records of the case conclusively showed that Seacat is not entitled to relief on any of his claims. We will next address whether the district court erred in making this finding.

### DID THE DISTRICT COURT ERR IN SUMMARILY DENYING SEACAT'S MOTION WITHOUT AN EVIDENTIARY HEARING?

Finally, Seacat claims his pleadings raised many instances where counsel was ineffective in failing to investigate and present exculpatory evidence, and he should have received an evidentiary hearing on those claims. To recap, Seacat presented 31 claims to the district court at the preliminary hearing. The district court found that 23 of the claims dealt with trial errors and that Seacat had offered no exceptional circumstances excusing his failure to raise the issues in his direct appeal. The district court denied the three ineffective assistance of counsel claims raised in the supplement as untimely. Finally, the district court found that Seacat had sufficiently raised five ineffective assistance of counsel claims but found the claims did not warrant an evidentiary hearing.

"When the district court reviews the motion, files, and records; holds a preliminary hearing; and summarily denies a K.S.A. 60-1507 motion—as occurred here—[this court is] in as good a position as the district court to consider the merits. As such, review is unlimited." *Hayes v. State*, 307 Kan. 9, 12, 404 P.3d 676 (2017).

*23 Trial Errors*

"'A movant has the burden to prove his or her K.S.A. 60-1507 motion warrants an evidentiary hearing; the movant must make more than conclusory contentions and must

22

state an evidentiary basis in support of the claims, or an evidentiary basis must appear in the record.'" *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014) (quoting *Holmes v. State*, 292 Kan. 271, 274, 252 P.3d 573 [2011]).

In these 23 claims, Seacat alleged a variety of misdeeds or errors by the KBI, investigators, prosecutors, the fire Marshall, the ATF, and others. Seacat also claimed the district court made several errors in admitting evidence at his trial. The district court addressed these claims in 18 pages of its 34-page memorandum decision. We will not engage in any further analysis here except to find that the district court correctly dismissed these claims. First, Seacat's assertions are conclusory because he provides no support for his allegations. He did not list witnesses or proffer evidence to support his assertions. Second, the district court correctly found that all the errors alleged in these claims were trial claims that cannot be raised in a postconviction motion.

A K.S.A. 60-1507 motion may not be used as a substitute for a direct appeal involving mere trial errors or as a second appeal unless constitutional rights are implicated, and exceptional circumstances excuse the failure to appeal. *Pabst*, 287 Kan. at 6; Supreme Court Rule 183(c)(3). As the district court found, Seacat offered no exceptional circumstances excusing his failure to raise these issues in his direct appeal. The district court did not err in summarily dismissing these claims.

*Five Ineffective Assistance of Counsel Claims*

> "To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984])." *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different, with a reasonable probability meaning a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

Seacat's original motion and corresponding amendment alleged some deficiency by Seacat's trial team. More specifically, Seacat alleged that Falk failed to subpoena Cox phone records; Falk failed to subpoena life insurance policies; Falk failed to present a video of a gun or call an expert to testify about his wife's body position; Falk failed to produce evidence about his wife's alleged pregnancy; and Falk failed to subpoena his wife's supervisors to testify about her alleged pending layoff.

Again, Seacat made a series of conclusory allegations with no witness list or evidentiary support. More importantly, he does not explain how the perceived deficiency of counsel would likely undermine confidence in the outcome of his case. Without a sufficient allegation of prejudice, Seacat's claims must fail. Seacat presented nothing in his motion to convince the district court that he was entitled to relief and that an evidentiary hearing was necessary. The district court correctly found that the motion, files, and records of the case conclusively showed that Seacat was not entitled to relief. As a result, the district court did not err in summarily denying Seacat's claims.

Affirmed.